## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WOMEN'S APPAREL GROUP, LLC | Case No. 11- 16217 (JNF) |
| Debtor. | |

## DEBTOR'S MOTION REQUESTING (I) APPROVAL OF (A) ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, AND SUBJECT TO COMPETING OFFERS; AND (B) BID AND AUCTION PROCEDURES; AND (II) RELATED RELIEF

Women's Apparel Group, LLC, the above-captioned debtor and debtor-in-possession (the

"**Debtor**"), by and through its undersigned counsel, hereby files this motion (the "**Motion**"),

pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11

U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-5 and 6004-

1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of

Massachusetts (the "**Local Rules**"), requesting (A) approval of that certain Asset Purchase

Agreement (the "**Purchase Agreement**") entered into by and between the Debtor and Distinctive

Apparel, Inc. ("**DAI**" or the "**Stalking Horse Purchaser**"), with respect to the proposed sale (the

"**Sale**") of substantially all of the Debtor's assets (the "**Acquired Assets**") outside the ordinary

course of business and free and clear of all liens, claims, encumbrances and other "interests"

within the meaning of 11 U.S.C. § 363(f) (collectively, the "**Encumbrances**") to the Stalking

Horse Purchaser or to any other Successful Bidder(s) (the **"Alternative Purchaser"**), a copy of

which is attached hereto as Exhibit A; (B) entry of an Order substantially in the form attached

hereto as Exhibit B approving the bidding and auction procedures (the "**Bid Procedures**") set

forth in Exhibit C attached hereto; (C) approval of the sale after hearing (the "**Sale Hearing**") of

substantially all of the Debtor's assets outside the ordinary course of business and free and clear

of all Encumbrances either to the Stalking Horse Purchaser or to the Alternative Purchaser; and

(D) related relief.  In support of this Motion, the Debtor respectfully represents:

## Status of the Case and Jurisdiction

1.        On June 29, 2011 (the "**Petition Date**"), NL Ventures VII United, L.L.C., La

Vita, Inc., Your Label, Inc., and Suburban Service Corp. (collectively, the "**Petitioning**

**Creditors**") initiated an involuntary petition against the Debtor under Chapter 7 of the

Bankruptcy Code, alleging that they were due claims in excess of the amount provided in 11

U.S.C. §303(b) that were not contingent as to liability or the subject of a bona fide dispute as to

liability or amount net of  the value of any lien on property of the debtor securing such claims.

2.        On June 30, 2011, the Bankruptcy Court entered an order limiting the ability of

the Debtor to convey assets other than in conformity with 11 U.S.C. §363. Docket No. 20

3.        On July 12, 2011, and notwithstanding the Debtor's opposition to the Petitioning

Creditors alleged due claims, which the Debtor reserves its right to object to, the Debtor filed a

motion for entry of an order for relief (the "**Order for Relief**") and sought to convert this case to

one under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**"). Docket No. 47.

4.        On July 12, 2011, the Debtor also filed a Motion (the "**DIP Motion**") and Interim

Order (the "**DIP Interim Order**") for (I) Authorization to (A) Obtain Secured Post-Petition

Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364(c) AND (d); (B) Granting Security

Interests, Superpriority Claims and Adequate Protection; and (C) Use of Cash Collateral and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (C). Docket No. 48.

5.      On July 12, 2011, the Debtor filed a Motion for Order Approving (A) Maintenance of Existing Bank Accounts, (B) The Honoring of Checks Issued for Payment During the Period After the Petition Date and Prior to The Date of Conversion to Chapter 11, (C) Continued use of Existing Business Forms, (D) Maintenance of Cash Management System and (D) Limited Waiver of Section 345 Requirements with Respect to Bank Accounts (the "**Maintenance Motion").**  Docket No. 49.

6.      On July 13, 2011, the Bankruptcy Court entered an Order for Relief in this matter and allowed the conversion of this case under Section 706 of the Bankruptcy Code to a case under Chapter 11.

7.      The Debtor has continued in possession of its properties and is operating and managing its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee (a "**Committee"**) has not yet been appointed in this Case.

9.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

10.      The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules, and Local Rules 2002-5 and 6004-1.

## Background

11.     Debtor is in the business of selling women's clothing and accessories through its web site and mail order catalogs and operates its business from a location at 300 Constitution Drive, Taunton, Massachusetts.

12.     Prior to the Petition Date, certain loans and other financial accommodations were made available to the Debtor pursuant to (i) that certain Loan and Security Agreement dated as of October 17, 2008, among (as amended from time to time, the "**Pre-Petition Loan Agreement**") among the Debtor, Casual Living Acquisition, LLC, a Massachusetts limited liability company ("**CLA**") and Women's Apparel Marketing Group, LLC, a Massachusetts limited liability company ("**WAG Marketing**"; together with CLA and Debtor, collectively the "**Pre-Petition Borrowers**") and DAI (in such capacity, the "**Pre-Petition Lender**") as the successor in interest to Wells Fargo Bank, National Association (successor by merger to Wachovia Bank, National Association) and (ii) to all documents and/or instruments entered into in connection therewith to which Pre-Petition Lender and the Pre-Petition Borrowers are parties, as applicable, (each as amended, supplemented or otherwise modified prior to the commencement of this Case, collectively the "**Pre-Petition Loan Documents**"). Events of default have occurred and are continuing under the Pre-Petition Loan Documents.  As a result of such events of default, interest is accruing at the default rate in accordance with Section 1.77(b) of the Pre-Petition Loan Agreement.

13.     Moreover, following the occurrence of the events of default under the Pre-Petition Loan Documents and prior to the Petition Date, the Pre-Petition Lender exercised certain rights under a pledge agreement to vote the equity interests of the Debtor and, in connection therewith, appointed new members to the board of directors.

14.     Pursuant to the Pre-Petition Loan Documents, all obligations of the Debtor to Pre-Petition Lender of any kind or nature under the Pre-Petition Loan Documents (the "**Pre-Petition Obligations**") are secured by a first priority security interest held by Pre-Petition Lender in

4

substantially all of the Debtor's assets including, <u>without</u> <u>limitation</u>, and by way of general description only, accounts, intellectual property, real property and fixtures, inventory, equipment, goods, general intangibles, accounts receivable, deposit accounts (including without limitation bank accounts and all funds on deposit therein), chattel paper, general intangibles, contracts, letter of credit rights, commercial tort claims, if any, stock, documents of title, tangible and intangible personal and investment property, money, cash and all cash equivalents, and all cash held as cash collateral, books and records, all supporting obligations, and the proceeds and products of all of the foregoing as more particularly included and described in the Pre-Petition Loan Documents.

### The Debtor's Prepetition Marketing Efforts

15.    In March, 2011, the Debtor retained the investment banking firm of **Financo** Securities LLC to pursue sources of funding for the Debtor and/or potential buyers. No fewer than ninety-nine entities were contacted by Financo on behalf of the Debtor in this effort.

16.    Approximately 25 potential parties executed non disclosure agreements and review the information developed by the Debtor with Financo.

17.    Unfortunately, the Debtor was unsuccessful in obtaining funding or a buyer through this process. During the same period of time, Debtor's sales continued to fall below forecasts, and the financial condition of WAG further deteriorated.

18.    Because the Debtor was unable to obtain additional sources of liquidity or a buyer, and because its financial condition continued to deteriorate, the Board of Directors and the sole shareholder of the Debtor determined that it was in the best interest of all parties not to incur additional debt but to sell the assets of the Debtor and wind down its affairs.

19.    The Board of Directors of the Debtor (a) retained Conway MacKenzie, Inc. as its restructuring advisors to, among other things, perform a liquidation analysis of the Debtor and (b) retained the law firm of Pachulski Stang Ziehl & Jones LLP to provide bankruptcy and restructuring advice and advise the Board of Directors.

20.     With the assistance of its team of investment advisors and restructuring professionals, the Debtor received two offers worthy of consideration.  One involved a sale of its inventory to a third-party liquidator and the other involved an offer by the DAI to purchase the Debtor's senior and subordinated secured indebtedness (to be followed by a foreclosure under Article 9 of the applicable Uniform Commercial Code).

21.     The Debtor participated in extensive negotiations with DAI and its secured lenders in an attempt to obtain the best result for its creditors and ensure that and sale of its debt and subsequent foreclosure would not result in its creditors receiving less than they would in a liquidation.

22.     Through these negotiations, the Debtor was able to obtain a number of significant concessions from DAI including, without limitation:

(a)     a commitment by DAI to provide funding to the Debtor for all accrued ordinary course employee compensation and benefits through the date of any foreclosure sale and an agreement not to terminate any of the Debtor's employees for a period of time sufficient to minimize the Debtor's liability under the WARN Act;

(b)     a commitment by DAI to provide funding to the Debtor for all taxes accrued by the Debtor's business in its normal course through the date of any foreclosure sale;

(c)     a commitment by DAI to provide funding to the Debtor for all ordinary course obligations and liabilities to the Debtor's customers and the Debtor's vendors from the date of DAI's purchase of the debt through the date of any foreclosure sale;

(d)     an agreement by DAI to unconditionally release its lien on a tax refund owing to the Debtor in the approximate amount of $3.5 million;

(e)     an agreement by DAI to credit bid all of its senior and subordinated secured debt at any foreclosure sale, thereby ensuring that the proceeds from the tax refund would be available for distribution to the Debtor's unsecured creditors;

(f)     an agreement by DAI to increase its bid (with cash) to ensure that the total sales proceeds would be no less than $8 million, in the

6

event an unrelated third party submitted a higher bid at the foreclosure sale;

(g)     an agreement by DAI to exclude $250,000 in cash from the assets to be sold at the foreclosure sale to ensure the Debtor had funds to wind down its affairs;

(h)     an agreement by DAI, in the event it was the successful purchaser at the foreclosure sale, to offer employment to at least 120 of the Debtor's employees which would preserve jobs at the Debtor's facility in Taunton and minimize employee WARN Act claims against the Debtor;

(i)     a commitment by DAI, in the event it was the successful purchaser at the foreclosure sale, to seek releases of claims against the Debtor from any creditor of the Debtor who DAI might contract with; and

(j)     a requirement that any bidder at a foreclosure sale be required to comply with the foregoing agreements and commitments to ensure that the Debtor would receive no less benefits than it had negotiated with DAI; and

23.     After analyzing and comparing the competing offers and obtaining the advice of its professionals, the Board of Directors of the Debtor determined, in the exercise of its business judgment, that the debt sale was the best offer.

24.     Based on that analysis, the Debtor consented to sale of its existing senior and subordinated secured debt to DAI, on the terms and conditions described above.

25.     DAI thereafter made arrangements to conduct a foreclosure sale of the Debtor's assets that was scheduled for June 30, 2011 and complied in all respects with its commitments to advance funds to the Debtor so it could remain a going concern and make payments to its employees, vendors, customers and taxing authorities.

26.     The foreclosure sale and the process of winding up the affairs of the Debtor were cut short upon the filing by the Petitioning Creditors.

27.     The sale contemplated in the APA described below is a continuation of the effort of the Debtor to engage in the orderly transition of its business with the least disruption to its customers, employees and vendors by maintaining the Debtor as a going concern until such sale is approved,

## The Purchase Agreement

28.     The material terms of the Purchase Agreement are as follows:[1]

Acquired Assets.  At the Closing, and upon the terms and conditions contained in the Purchase Agreement, and subject to the approval of this Court and pursuant to the Sale Order, the Debtor shall sell, transfer, convey, assign and deliver to Stalking Horse Purchaser, and Stalking Horse Purchaser shall purchase, acquire, assume and accept from the Debtor, all right, title and interest of the Debtor in, to and under the Acquired Assets, free and clear of all Liens, Claims, Interests and Encumbrances, other than any Permitted Liens and Permitted Exceptions, to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.  The Acquired Assets include all of the Debtor's rights title and interest in, to and under the Purchased Assets as identified in the Purchase Agreement.

Purchase Price.  The aggregate consideration for the Acquired Assets (the "**Purchase Price**") shall be $10,500,000, which such amount shall be paid by Stalking Horse Purchaser first by way of a dollar-for-dollar credit against the Pre-Petition Obligations and, to the extent such amounts are less than the Purchase Price, thereafter by way of a dollar-for-dollar credit against the post-petition obligations owing to the Stalking Horse Purchaser under the DIP Order, in each instance pursuant to section 363(k) of the Bankruptcy Code, and that amount may be allocated among the Acquired Assets in any manner the Stalking Horse Purchaser deems appropriate.

Assumed Liabilities.  Stalking Horse Purchaser is not assuming any liabilities of the Debtors, including any liabilities under any of the Debtor's executory contracts.[2]

Excluded Assets.[3]  The Excluded Assets shall refer to any assets owned by any of the Debtor that are not Purchased Assets and shall include any equity interests held by Debtor.

Conditions to Obligations.  The obligation of the Debtor and Stalking Horse Purchaser to consummate the transactions to be performed by them in connection with the Closing are subject to the satisfaction or waiver or various closing conditions contained in Article 7 of the Purchase Agreement, which include but are not limited to the Bankruptcy Court entering the Bid Procedures Order and Sale Order.

Privacy Policy.  The Stalking Horse Purchaser has represented that it able to continue the Privacy Policy of the Debtor as to any Customer List or other personal information purchased by the Stalking Horse Purchaser.

---

[1]     This summary of the Purchase Agreement is provided for the Court's convenience only.  To the extent that the summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.  Capitalized terms used but not defined in this summary shall have the meanings given in the Purchase Agreement.

[2]     Nothing herein shall prohibit any Bidder from submitting a bid that provides for assumption of the Debtors' liability.

[3]     The initial designation of an asset as an Excluded Asset in the Purchase Agreement should not be construed to prevent a bidder from bidding on such asset or submitting a blacklined Purchase Agreement that seeks to include such asset as an Acquired Asset.

Representations and Warranties. The Purchase Agreement is subject to certain representations and warranties by Debtor and Stalking Horse Purchaser, as set forth in Articles 4 and 5, respectively, of the Purchase Agreement.

## The Assumption, Assignment and Sale of Executory Contracts

29.     Although the Stalking Horse Purchaser's bid is not conditioned upon the assumption and assignment of any of the Debtor's executory contracts or unexpired leases, the Debtor may seek to assume, assign and sell to one or more Alternative Purchasers some or all of its executory contracts (any such contracts, the "**Assigned Contracts**"). To facilitate the assumption and assignment of the Assigned Contracts to one or more potential Alternative Purchasers who become one or more the Successful Bidders, the Debtor will serve a copy of this Motion and a notice of assumption and assignment (the "**Notice of Assumption and Assignment**") on all non-Debtor parties to Assigned Contracts ("**Contract Parties**").

30.     In the event that an Alternative Purchaser is the Successful Bidder for some or all of the Acquired Assets, such Alternative Purchaser shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment and sale of any Assigned Contract. The Court shall make its determinations concerning adequate assurance of future performance under the Assigned Contracts pursuant to section 365(b) at the hearing on the Sale (the "**Sale Hearing**"). Objections to the Debtor's proposed amounts, if any, that are owed to each Contract Party in order to cure any defaults that exist under such contract (the "**Cure Amounts**") will be resolved by the Court at the Sale Hearing.

**REQUESTED RELIEF**

31.     By this Motion, the Debtor is requesting that this Court, inter alia, subject to competing offers and to Court approval at the Sale Hearing contemplated by the Bid Procedures, (a) authorize the sale of the Acquired Assets to the Stalking Horse Purchaser pursuant to the terms of the Purchase Agreement, free and clear of all Encumbrances pursuant to sections 105, 363(b), (f) and (m) of the Bankruptcy Code, with such Encumbrances to attach to the sale proceeds of the Acquired Assets with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale; and (b) approve the assumption, assignment and sale of the Assigned Contracts to one or more Alternative Purchasers under sections 363 and 365 of the Bankruptcy Code.

**BASIS FOR RELIEF**

**A.     The Sale of the Acquired Assets Pursuant to the Purchase Agreement is Authorized by Bankruptcy Code Section 363(b)**

32.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(l).  Although section 363(b) of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See In re Cadkey Corporation*, 317 B.R. 19, 22-23 (Bankr. D. Mass. 2004); *see also In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001); In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986); *Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d

10

Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999) (concluding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991) (same).

33.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale of assets outside the ordinary course of business, namely: (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) that adequate and reasonable notice has been provided to interested persons; (c) that the debtor has obtained a fair and reasonable price; and (d) good faith.  *See Abbotts Dairies,* 788 F.2d at 143; *Titusville Country Club v. Penn Bank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd,* 104 B.R. 702, 704 (Bankr. E.D. Pa.1989).

34.    The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the assets; and whether the asset is decreasing or increasing in value.

124 B.R. at 176.

35.    The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with

11

adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith." *Id.*

36.     In addition, the relief requested by this Motion is appropriate and within the Court's equitable powers under section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liq. Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

37.     A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons."  *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and

circumstances of each case. *Lionel,* 722 F.2d at 1071; *see also Montgomery Ward,* 242 B.R. at

155.

38.    The Debtor submits that more than ample business justification exists to sell the

Acquired Assets to the Stalking Horse Purchaser or any other Successful Bidder, as defined in

*Debtor's Motion Requesting Entry Of Order: (A) Approving Bid Procedures Relating To Sale Of*

*The Debtor's Assets; (B) Scheduling A Hearing To Consider The Sale; (C) Approving The Form*

*And Manner Of Notice Of Sale By Auction; (D) Establishing Procedures For Noticing And*

*Determining Cure Amounts; And (E) Granting Related Relief* (the "**Bid Motion**") and the Bid

Procedures attached to the Bid Motion as Exhibit A, as the case may be, pursuant to the terms of

the proposed Bid Procedures.  The Debtor has carefully considered and analyzed the Stalking

Horse Purchaser's offer as set forth in the Purchase Agreement, and in light of the circumstances

described herein, including limited funding resources, have concluded that a sale of the Debtor's

Assets is in the best interests of the estate and will maximize the value of the Debtor's estate.

Thus, a sound business purpose justifies the Sale of the Acquired Assets.  The Debtor has limited

cash and believes that a prompt sale at the outset of this bankruptcy case is vital to maximizing

recovery to creditors and other parties in interest.  Thus, the Sale presents the best opportunity to

realize value for the Debtor's creditors.

39.    The Debtor has proposed the sale of the Acquired Assets after thorough

consideration of all viable alternatives, and has concluded that the sale is supported by a number

of sound business reasons.   As discussed in "The Debtor's Pre-Petition Marketing

Efforts" section above, the Debtor had determined prior to the filing of this case that it would be

unable to sustain its business as currently structured and capitalized and had already commenced

a process of sale and transition that maximized value to its creditors, reduced claims against the

Debtor, and preserved jobs for many of the Debtor's employees.  Since the filing of this case, the

circumstances have not changed and the Debtor, in consultation with its advisors, has further

determined that it cannot sustain a stand-alone operational reorganization based on among other

things, the level of the Debtor's secured debt and the fact that the Debtor's operations were cash

flow negative prior to the Petition Date.  Hence, the Debtor has determined, with the full support

of DAI, in its capacity as post-petition secured lender (hereinafter referred to in such capacity as

the "**DIP Lender**") that a sale of the Debtor's assets provides the best and most efficient means

for the Debtor to maximize the value of its estate.

40.     The Debtor submits that this constitutes significant consideration for the Acquired

Assets.  The proposed Sale is further subject to an open market process through the solicitation

of competing bids in a Court-supervised auction (the "**Auction**").  Pursuant to the Bid Motion

and Bid Procedures, all potentially interested bidders will receive adequate and reasonable notice

of the opportunity to submit a competing bid prior to the Auction, and the Bid Procedures will

facilitate an open and competitive bidding process in which all parties will participate in good

faith.

41.     Moreover, the Purchase Agreement was the product of good faith, arm's length

negotiations between the Debtor, on the one hand, and the Stalking Horse Purchaser, on the

other, and was negotiated with the active involvement of the Debtor's officers and professionals.

The Debtor believes and submits that the Sale of the Debtor's assets to the Stalking Horse

Purchaser pursuant to the Purchase Agreement is not the product of collusion or bad faith.  All

the evidence demonstrates that the Purchase Agreement is the product of arm's length

negotiations between the Debtor, the Stalking Horse Purchaser, and their respective professional

advisors.  For these reasons, the Sale satisfies the good faith element of the "sound business

14

purpose" test.  *Compare In re After Six, Inc.,* 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) (good

faith found where officers, directors and employees of debtor had no apparent connection to

purchasers) *with Abbotts Dairies*, 788 F.2d at 147-48 ("Typically, the misconduct that would

destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the

purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders."); *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15,

22 (Bankr. E.D. Pa. 1987) (evidence of inside dealing fatal to good faith requirement).

42.    As explained above, the Debtor, with the assistance of Financo, had extensively

marketed the Debtor's assets prior to the Petition Date.  The Debtor is seeking to retain Financo

in connection with this case so they can continue their marketing effort during the sale process

(and conduct the sale process, including the Auction) in accordance with the Sale Motion and

Bid Procedures, and once entered, the Bid Order, which implements certain procedures designed

to maximize the value that will be realized from the sale of the Acquired Assets.  As a result of

the Debtor's current marketing efforts, the Stalking Horse Purchaser's offer will be fully tested

by the market and will constitute fair and reasonable consideration for the Acquired Assets and

there will be ample time and opportunity for potential Qualified Bidders to submit overbids.  The

Debtor, in the exercise of its business judgment, and in consultation with its professionals,

believes that the proposed Sale to the Stalking Horse Purchaser, or any other Successful Bidder,

will constitute the highest and best offer for the Acquired Assets. For these reasons, the Debtor

believes the sale of the Acquired Assets is entirely within its sound business judgment, is

justified by sound business reasons, and is in the best interests of the Debtor and its estate.

**B.    The Sale of Assets Free and Clear of Liens, Claims and Interests is
Authorized Under Bankruptcy Code Section 363(f)**

43.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell

property "free and clear of any interest in such property of an entity other than the estate" if any

of the following conditions are satisfied:

15

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

44.     The Debtor believes one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the proposed Sale of the Acquired Assets.

45.     Section 363(f)(2) applies not only to parties who affirmatively consent to the sale; it applies also to those parties that have failed to object to or otherwise dispute the sale.  As dozens of courts have recognized, where an entity has not objected to a section 363 sale, consent may be implied for purposes of section 363(f)(2).  *See*, *e.g.*, *In re GPX International Tire Corporation*, 2009 WL 8032810 at 4 (Bankr. D. Mass. 2009); *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) (in context of section 363(f), "lack of objection (provided of course there is notice) counts as consent."); *In re James*, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997) (section 363(f)(2) satisfied where secured creditor failed to object to proposed sale and thus "implicitly conveyed its consent to the sale"); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (because of tax lien holder's failure to object to sale, it "may be deemed to have consented to the sale for purposes of section 363(f)(2)"); *In re Elliot*, 94 B.R. 343, 345-46 (E.D. Pa. 1988) (implied consent sufficient to authorize section 363(f)(2) sale; consent implied from non-debtor that "received notice of the proposed sale and also admits that it did not file any timely objection."); *In re Gabel*, 61 B.R. 661, 664-65 (Bankr. W.D. La. 1985) (estopping secured

16

creditor that was properly noticed and failed to object from denying its implied consent to sale of property under 363(f)).

46.    As quoted above, section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000).

47.    In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." 209 F.3d at 258. The court observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property." *Id.* at 258 (citing 3 COLLIER ON BANKRUPTCY 363.06[1]). *See also In Re Colarusso*, 280 B.R. 548, 556-57 (Bankr. D. Mass. 2002).

48.    As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

49.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Acquired Assets free and clear of all interests within the meaning of section 363(f) of the Bankruptcy Code, including any Encumbrances (together, **"Interests"**). *See Citicom Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

50.     The Debtor submits that each Interest satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the sale, subject to any claims and defenses the Debtor may possess with respect thereto.   The Debtor accordingly requests authority to convey the Acquired Assets to the Stalking Horse Purchaser, free and clear of all Interests, with such Interests to attach to the proceeds of the Sale, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale.

51.     Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).   *See, e.g., In re Oscient Pharmaceuticals* Corporation, 2009 WL 8047096  at 3 (Bankr. D. Mass. 2009); In *re Trans World Airlines, Inc.,* 2001 WL 1820325 at *3, *6 (Bankr. D. Del. Mar. 27, 2001) (explaining that "courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of §363(f)"); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (authorizing sale free and clear of tort claims even if such claims are not covered specifically by the provisions of §363(f)).  As the *Trans World Airlines* court explained, "[t]he authority to sell free and clear is broad.  It reflects a compelling policy to encourage bankruptcy sales subject only to claims of a specific and recognized nature in the subject property." *Trans World*, 2001 WL 1820325, at *3. Thus, even in the case of general unsecured claimants, including tort claimants, who arguably have no specific interest in a debtor's property (and, therefore, section 363 of the Bankruptcy Code would not be applicable to such claims), courts have held that the authority to conduct

18

sales free and clear of such claims is still within their equitable powers. *White Motor Credit,* 75 B.R. at 948.

52. The Debtor is informed and believes that the Pre-Petition Lender and DIP Lender will consent to the sale of their collateral (which will satisfy 11 U.S.C. § 365(f)(2)). The Debtor has conducted a UCC search to determine possible lienholders of the Debtor's assets in conjunction with the proposed Sale of the Acquired Assets. The Debtor has served any such purported lienholders notice of this Motion, and will serve such parties with notice of any Order approving the relief requested by this Motion.

53. Accordingly, this Court should approve the sale of the Acquired Assets to the Stalking Horse Purchaser, free and clear of Interests under Bankruptcy Code section 363(f) and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

54. Further, to the extent that some of the Debtor's Assets are not encumbered by the liens and security interests held by Pre-Petition Lender and DIP Lender, subsection 363(f)(5) would permit the Sale free and clear of any unrecorded "interest" in such assets. The Debtor believes the rights of any unknown claimant could be valued and allowed as a claim against the Debtor's estate, and thus the claimant could be compelled to accept a money satisfaction of its interest in property, and section 363(f)(5) would be satisfied. *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (holding that section 363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims."). In addition, because the Debtor is unaware of the existence of any

interest in, or of the right of any third party to assert such an interest in such Assets other than the Pre-Petition Lender and DIP Lender, the Debtor submits the surprise assertion of an interest will be in bona fide dispute and, therefore, subsection 363(f)(4) would apply.

55.     Because the section 363(f) requirements have been met, the Stalking Horse Purchaser or any other Successful Bidder, as the case may be, should not be liable, as a successor to the Acquired Assets or otherwise, for any of the Debtor's pre-petition liabilities.  As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets.  The Third Circuit Court of Appeals has held that a buyer of a debtor's assets pursuant to sections 363(b) and 363(f) takes free from successor liability resulting from any pre-existing claims.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress"), *aff'd*, 332 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability.").

## C.     The Stalking Horse Purchaser is Entitled to Credit Bid

56.     As set forth in the Bid Motion, the Stalking Horse Purchaser shall (i) have the right to credit bid its prepetition and post-petition secured claims in accordance with Bankruptcy Code section 363(k).  Moreover, pursuant to the Bid Procedures, the Stalking Horse Purchaser is not required to post any cash deposit in order to be deemed a Qualified Bidder.

57.     This Motion seeks to confirm the Stalking Horse Purchaser's right to credit bid up to the full amount of the secured claim (estimated to be approximately $11,100,000 at the time of

the Auction) in connection with the bidding on the Acquired Assets. Confirmation of the

Stalking Horse Purchaser's right to credit bid is consistent with Bankruptcy Code section 363(k).

That statute provides as follow:

> At a sale under subsection (b) of this section of property that is
> subject to a lien that secures an allowed claim, unless the court for
> cause orders otherwise the holder of such claim may bid at such
> sale, and, if the holder of such claim purchases such property, such
> holder may offset such claim against the purchase price of such
> property.

11 U.S.C. § 363(k).

58.    Under section 363(k), a secured creditor is entitled to bid an amount up to its

entire claim; the "offset" (*i.e.*, credit) is not limited to the value of the collateral. *See, e.g., In re

Submicron Systems Corp.*, 432 F.3d 448, 459 (3d Cir. 2006) ("It is well settled among district

and bankruptcy courts that creditors can bid the full face value of their secured claims under §

363(k)"); *In re Suncruz Casinos, LLC*, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("The plain

language of [section 363(k)] makes clear that the secured creditor may credit bid its *entire claim*,

including any unsecured deficiency portion thereof.") (emphasis in original); *In re Morgan

House Gen. P'Ship*, 1997 U.S. Dist. LEXIS 1306 at *1 (E.D. Pa. 1997); *In re Realty Invs., Ltd.

V*, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987); *Criimi Mae Servs. Ltd. P'ship v. WDH Howell,

LLC (In re WDH Howell, LLC)*, 298 B.R. 527, 532 n.8 (D.N.J. 2003).

59.    Thus, the right to credit bid is not affected by any prior valuation of an allowed

claim under section 506(a) of the Bankruptcy Code. *In re Submicron Systems Corp.*, 432 F.3d at

461 ("§ 363 speaks to the full face value of a secured creditor's claim, not to the portion of that

claim that is actually collateralized as described in § 506."); *In re Morgan House Gen. P'ship*,

1997 U.S. Dist. LEXIS 1306 at *5 (holding that creditors may bid "to the extent of their claim"

under § 363(k)); *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n.12 (Bankr. S.D. Fla. 1995) ("[A]

secured creditor may bid in the full amount of the creditor's allowed claim, including the secured

portion and any unsecured portion thereof") (citing legislative history).

60.    Nor is a section 506(a) valuation required before a sale pursuant to section 363(b)

of the Bankruptcy Code can be approved.  *In re Submicron Systems Corp.*, 432 F.3d at 461

("*Section 363* attempts to *avoid* the complexities and inefficiencies of valuing collateral

altogether by substituting the theoretically preferable mechanism of a free market sale to set the

price.  The provision is premised on the notion that the market's reaction to a sale best reflects

the economic realities of assets' worth.  Naturally, then, courts are not required first to determine

the assets' worth before approving such a market sale.") (emphasis in original).

61.    As discussed above, as of the Auction date, the Debtor estimates that the Stalking

Horse Purchaser will hold a claim of approximately $11,100,000, secured by substantially all of

the assets of the Debtor.  Accordingly, the Stalking Horse Purchaser has the right to bid up to the

entire amount of its claim for the Acquired Assets.

**D.    The Stalking Horse Purchaser is a Good Faith Purchaser and is Entitled to
the Full Protections of Bankruptcy Code Section 363(m)**

62.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

63.    While the Bankruptcy Code does not define "good faith," the Court of Appeals

for the First Circuit, in construing section 363(m), has suggested that the phrase encompasses a

purchaser who buys for value, in good faith, and without knowledge of adverse claims.  *See In re Mark Bell Furniture Warehouse. Inc.*, 992 F.2d 7, 8 (1ˢᵗ Cir. 1993) (citations omitted).  To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the Debtor or an attempt to take grossly unfair advantage of the other bidders."  *Id.*

64.     The Third Circuit Court of Appeals, in *Abbotts Dairies* has stated:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

65.     Moreover, the Second Circuit also has indicated that a party would have to show fraud or collusion between the buyer and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  *See In re Colony Hill Assocs.,* 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").  Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.,* 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus.*, 572 F.2d at 1198 (7th Cir. 1978)).

66.     The Debtor intends to make an appropriate showing at the Sale Hearing that the Purchase Agreement with the Stalking Horse Purchaser is the result of a negotiated, arm's-length transaction, in which such buyer at all times acted in good faith.  The Debtor thus requests that

the Court find that the Stalking Horse Purchaser will be purchasing the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

67.     The Debtor additionally requests that the Court find that Stalking Horse Purchaser or any other Successful Bidder, as the case may be, is entitled to the protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.  Section 363(m) of the Bankruptcy Code provides, in pertinent part: "The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal." 11 U.S.C. § 363(m).

68.     Section 363(m) thus protects the purchaser of assets sold pursuant to section 363(b) from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) applies to sales of interests in tangible assets, such as the Acquired Assets at issue here.

69.     As required by Section 363(m) of the Bankruptcy Code, the Debtor, Pre-Petition Lender, and DIP Lender have acted in good faith in negotiating the Sale of the Acquired Assets. There is no evidence of fraud or collusion in the terms of the Sale.  To the contrary, as discussed throughout this Motion, the Sale will be the culmination of a lengthy solicitation and negotiation process in which all parties will be represented by sophisticated counsel and financial advisors. Notwithstanding the fact that the directors of the Debtor consist of individuals appointed by the Stalking Horse Purchaser, such directors have acted independently and in accordance with their fiduciary duties and there is no evidence to the contrary.  Moreover, the Stalking Horse Purchaser is not, nor would any other Successful Bidder be, an insider of the Debtor as that term

24

is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms length, good faith basis.  The Bid Procedures are designed to ensure that no party is able to exert undue influence over the process.  Furthermore, the Bid Procedures are designed to prevent the Debtor, the Stalking Horse Purchaser, or any other Successful Bidder from engaging in any conduct that would cause or permit the Sale to be avoided, or costs or damages to be imposed under, section 363(n) of the Bankruptcy Code.  All creditors and parties in interest will receive notice of the Sale and will be provided an opportunity to be heard.  The Debtor submits that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under section 363(b) of the Bankruptcy Code.   Under the circumstances, the Stalking Horse Purchaser or any other Successful Bidder, as the case may be, should be afforded the benefits and protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

### E.    The Court Should Approve the Assumption, Assignment and Sale of the Assigned Contracts to one or more Alternative Purchasers, if any

70.    While the assets to be purchased as part of the Transaction do not include the Excluded Assets, and do not provide for the assumption by the Stalking Horse Purchaser of any executory contracts of the Debtor, the Debtor requests approval of the assumption, assignment and sale of the Assigned Contracts to one or more Alternative Purchasers under sections 363 and 365 of the Bankruptcy Code.

71.    The Assigned Contracts are those contracts or leases that are to be assumed by the Debtor and assigned and sold to one or more Alternative Purchasers as part of the sale transaction under the Purchase Agreement.  The Debtor further requests that the sale order provide that the Assigned Contracts will be assigned to, and remain in full force and effect for the benefit of, one or more Alternative Purchasers, notwithstanding any provisions in the

25

Assigned Contracts, including those described in sections 365(b)(2) and (f)(l) and (3) of the Bankruptcy Code, that prohibit such assignment.

72.      Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> > (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
> >
> > (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. 11 U.S.C. § 365(f)(2).

73.      Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

74.      Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, it is well established that the decision to assume or reject an executory contract

or unexpired lease is a matter within the "business judgment" of the debtor. *See In re Taylor*, 913 F.2d 102 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989). Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate. *Sharon Steel*, 872 F.2d at 40.

75.     The assumption, assignment and sale of the Assigned Contracts will benefit the Debtor's estate. Indeed, absent the Debtor's ability to assume, assign and sell the Assigned Contracts, one or more Alternative Purchasers might not be willing to consummate the transaction.

76.     The Debtor intends to serve a copy of this Motion and a Notice of Assumption and Assignment on all Contract Parties and in accordance with the following procedures:

The Debtor (or its agent) served, concurrently with the filing of the Motion, by overnight courier, electronic mail, or same-day messenger delivery, the Notice of Assumption and Assignment upon all known non-debtor parties to the Assigned Contracts. The Notice of Assumption and Assignment set forth (i) the intent of the Debtor to assume the Assigned Contracts and assign them to one or more Alternative Purchasers, and (ii) the Cure Amounts if any. The Notice of Assumption and Assignment indentified the Assigned Contracts and the Cure Amounts the Debtor believes must be paid to cure all defaults under the Assigned Contracts. If no amount was listed on the Notice of Assumption and Assignment, the Debtor believes that there is no Cure Amount due.

Bankruptcy Rule 6006(a) provides that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease other than as part of a plan, is governed by Rule 9014." Any objections to (i) the assumption and assignment of an Assigned Contract, or (ii) the amount asserted as the Cure Amount (each, an "Assumption and/or Cure Objection") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Assigned Contract (the "**Claimed Cure Amount**").

If an Assumption and/or Cure Objection is timely filed, the Debtor requests that a hearing with respect to that objection shall be held before the Court at the hearing on the Sale. If, however, an Assumption and/or Cure Objection is not timely filed and served, the assumption and assignment of the applicable Assigned Contract will proceed without further notice at the Sale Hearing. The Debtor also requests that parties failing to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert Cure Amounts differing from those listed on the

exhibit to the Notice of Assumption and Assignment and, subject to payment of the Cure Amount(s) listed on such contract with respect to their Assigned Contract(s), shall be forever barred and estopped from asserting or claiming against the Debtor or one or more Alternative Purchasers that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Assigned Contract.

If no Cure Amounts are due under the Assigned Contract, and the non-debtor party to the Assigned Contract does not otherwise object to the Debtor's assumption and assignment of the Assigned Contract, no further action need be taken on the part of that non-debtor party. The Debtor also requests that Assumption and/or Cure Objections that object solely to the Cure Amount not prevent or delay the Debtor's assumption and assignment of any Assigned Contracts. If a party objects solely to a Cure Amount, the Debtor may, in its sole discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as the Debtor holds the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the Debtor can, without further delay, assume and assign the Assigned Contract that is the subject of the objection. Under such circumstances, the objecting party's recourse shall be limited to the funds held in reserve.

77.    The Debtor submits the aforementioned procedures provided good and sufficient notice to non-debtor parties to the Assigned Contracts and should be approved in all respects. The Notice of Assumption and Assignment will be substantially the same as other similar notices that courts in the District of Massachusetts have approved in chapter 11 cases, including this Court. In addition, the Debtor believes that each counterparty to an executory contract which will be assumed and assigned in connection with the Sale has consented, or will be deemed to have consented if the counterparty does not object, to such assumption and assignment.

78.    As set forth herein, any Alternative Purchaser is responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of any Assigned Contract. The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco*

*Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). To the extent necessary, any Alternative Purchaser shall provide evidence of its ability to provide adequate assurance to Contract Parties to the Assigned Contracts at the Sale Hearing.

79.     The Debtor will demonstrate at the Sale Hearing that all requirements for assumption and/or assignment of such contracts have been satisfied. The Debtor, in its sound business judgment, believes assuming and assigning the Assigned Contracts to one or more Alternative Purchaser is in the best interests of its estate. Moreover, as noted above, each non-debtor party to an Assigned Contract has received notice of the proposed assumption and assignment, and the proposed cure amount, and has had a reasonable opportunity to object thereto. For these reasons, the Debtor's assignment of the Assigned Contracts in furtherance of the Sale should be approved.

### F.     Relief from the Fourteen (14) Day Waiting Periods Under Bankruptcy Rules 6004(h) Is Appropriate

80.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rule 6004(h) is waived.

81.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Collier on Bankruptcy suggests that the fourteen (14)

day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

82.    All creditors and parties in interest will receive notice of the Sale or a competing transaction and will be provided with an opportunity to be heard.  The Debtor submits that such notice is adequate for entry of the order approving this Motion and waiving the fourteen (14) day waiting periods under Bankruptcy Rule 6004(h).

## NOTICE

83.    Notice of this Motion (and the Purchase Agreement without schedules) has been sent by first-class mail, overnight mail, or hand delivery, as appropriate, to the following parties or, in lieu thereof, to their counsel, if known: (i) all entities that claim any interest in or lien upon the Acquired Assets; (ii) all governmental taxing authorities that have, or as a result of the sale of the Acquired Assets may have, claims, contingent or otherwise, against the Debtor; (iii) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (iv) the 20 largest creditors of the Debtor; (v) all taxing authorities in the jurisdiction in which the Debtor operate (vi) all interested governmental, pension and environmental entities known by the Debtor to assert jurisdiction over the Debtor and to have an interest in the proposed Sale; (vii) the Office of the United States Trustee;  (vii) counsel to the Debtor's pre- and post- petition secured lenders; and (x) entities known by the Debtor with an interest in purchasing the Acquired Assets.  In light of the nature of the relief requested herein, the Debtor submits that no further notice is necessary.

30

84.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the

sufficiency of notice and adequacy of service.  As discussed below, the content and manner of

service of this Motion in accordance with the Bid Motion and Order and the notices related

thereto satisfies all such requirements:

Section 363 Notice:  Section 363 of the Bankruptcy Code provides
that a trustee may sell assets other than in the ordinary course of
business "after notice and hearing." Under section 102(1) of the
Bankruptcy Code, the phrase "after notice and hearing" means
"notice as is appropriate in the particular circumstances, and such
opportunity for a hearing as is appropriate in the particular
circumstances." 11 U.S.C. § 102(1)(A).  The Debtor submits that
creditors have been provided notice of the salient details regarding
this Motion and the hearing on the relief requested hereby.
Accordingly, notice is sufficient under section 363 of the
Bankruptcy Code.

Federal Rule of Bankruptcy Procedure 2002: Bankruptcy Rule
2002 requires twenty days' notice of proposed sales of assets other
than in the ordinary course of business, provided that such notice
period may be reduced pursuant to Bankruptcy Rule 9006(c). In
addition, Bankruptcy Rule 2002 provides that notice of a sale shall
"include the time and place of any public sale, the terms and
conditions of any private sale and the time fixed for filing
objections." FED. R. BANKR. P. 2002. Local Rule 2002-l specifies
the parties on whom a motion for a sale other than in the ordinary
course of business must be served in cases pending in this
jurisdiction. In accordance with the Bid Motion, the Debtor has
provided sufficient notice of the Auction and Sale Hearing to the
appropriate parties.

Federal Rules of Bankruptcy Procedure 6004 and 6006:
Bankruptcy Rule 6004 requires that notices of sales of assets out of
the ordinary course of business comply with Rule 2002. As set
forth above, the Debtor has complied with Bankruptcy Rule 2002.
Bankruptcy Rule 6006 requires notice of a motion to assume or
assign an executory contract or unexpired lease to be served on the
counterparty to such contract or lease, as well as on other parties in
interest as this Court may direct.  The notice of the Motion will be
served on counterparties to the Assigned Contracts in satisfaction
of this requirement.

Local Bankruptcy Rules: MLBR 6004-1 MLBR 6004-1(b)
requires that motions seeking authority to sell estate property shall
be served on the debtor and its counsel, the United States Trustee,
any known creditor claiming a lien or security interest in the
property to be sold (and such creditor's counsel), all attorneys who
have filed appearances in the case, any attorneys for any approved

creditors or equity committee, and, if no creditors committee has been appointed, the twenty (20) largest unsecured creditors.

Procedural Due Process:  The notice of this Motion that is being provided is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object.  *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Motion and the hearing on the relief requested hereby.

85.     The Debtor submits that the notice that it has provided and intends to provide of this Motion is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.  The Debtor requests, pursuant to Bankruptcy Rule 6004(h), that the order approving this Motion become effective immediately upon its entry.

86.     No prior motion for the relief requested herein has been made to this or any other court.

## CONCLUSION

87.     The Debtor's proposed Sale of the Acquired Assets as described in this Motion and the Purchase Agreement, including the assumption, assignment and sale to one or more Alternative Purchaser(s) of the Assigned Contracts, is supported by sound business reasons, as set forth herein. The proposed Sale is proper, necessary and serves the best interests of the Debtor, its estate, and its creditors.  The Debtor thus requests that the Court approve the proposed Sale of the Acquired Assets (including the Assigned Contracts to one or more Alternative Purchaser) free and clear of all liens, claims, Encumbrances and Interests.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit B, (1) approving the Bid Procures set forth in Exhibit C, (2) approving the Notice of Sale substantially in the form attached hereto as Exhibit D, (3) authorizing the Debtor to proceed with the sale of the Acquired Assets free and clear of all Encumbrances and Interests as contemplated by this Motion and the Purchase Agreement,

subject to competing offers and entry of an order after the Sale Hearing in form and substance

satisfactory to the Debtor and the successful bidder, and (4) granting such other and further relief

as is just and proper.

Dated:  July 15, 2011

WOMEN'S APPAREL GROUP, LLC
By its counsel,
/s/ James F. Coffey
Richard S. Rosenstein (BBO #429100)
Peter Nils Baylor (BBO #033920)
James F. Coffey (BBO #552620)
NUTTER, MCCLENNEN & FISH, LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2000
rrosenstein@nutter.com

*Proposed Counsel for the Debtor
  and Debtor-in-Possession*

2029478.2