# Exhibit B

# financo, inc.    NEW YORK  •  BEVERLY HILLS  •  LONDON

All securities transacted through Financo Securities, LLC.  Member of FINRA & SIPC

July 15, 2011

Women's Apparel Group, LLC
300 Constitution Drive
Taunton, MA  02780

    Attention:   Steven Lightman - CEO

Dear Sirs:

This following sets forth the understanding and agreement (the "**Agreement**") between Financo, Inc., a Delaware corporation ("**Financo**"), and Women's Apparel Group, LLC (together with all affiliates, if any, the "**Company**").  Capitalized terms not defined in context herein shall have the meanings set forth in Schedule I hereto.  References herein to the "Company" shall be deemed to include any entity that the Company may form to effect any of the transactions contemplated hereby.  If appropriate in connection with performing its services for the Company hereunder, Financo may utilize the services of one of its affiliates, including Financo Securities LLC, in which case references herein to "Financo" shall as applicable be deemed to include such affiliates.

1. **Engagement of Financo**

    1.1 **Advisory Services**:  The Company hereby engages Financo as the Company's exclusive financial advisor to provide the Company with general strategic transaction advisory services and to advise it in connection with the potential Sale of the Company or its assets, including through a Section 363 process under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**").  The Company agrees, represents and warrants that, during the term of Financo's engagement hereunder, it will not retain, employ or solicit any third party providing services in connection with any Sale and, therefore, during the term hereof, Financo shall be providing services in connection with all potential Sales, whether with third parties identified by Financo or by others.  Financo's services shall include the following:

    (a) meet with the Company's management and familiarize itself, to the extent it deems appropriate and feasible, with the business, operations, properties, financial condition and prospects of the Company;

    (b) identify, update and review with the Company on an ongoing basis a list (the "**List**") of parties that Financo, in its reasonable business judgment, believes are prospective acquirors of the Company ("**Prospective Acquirors**");

    (c) approach those parties on the List of Prospective Acquirors that the Company approves ("**Approved Prospective Acquirors**") to inquire as to their interest in engaging in a Sale with the Company, coordinate the collection of Company due diligence materials and the delivery of such materials to such Approved Prospective Acquirors, provide advice and assistance to the Company in structuring and effecting a Sale, and, as requested by the Company, participate on the Company's behalf in negotiations for such a Sale; and

    (d) be available at the Company's request to meet, upon reasonable notice and at reasonable times, with the Company's Board of Directors (or, if applicable, a Special Committee of the Board of Directors) to discuss any Sale and its financial implications.

Women's Apparel Group, LLC
July 15, 2011
Page 2

- 1.2 **Company Discretion**: It is acknowledged that the Company is under no obligation to enter into any transaction, and may terminate negotiations with any party at any time. Financo shall not, unless specifically authorized in writing by the Company, have the authority to bind the Company to any Sale or any agreement or arrangement of any kind.

- 1.3 **Confidentiality Agreements; Distribution of Due Diligence Materials**: In connection with the foregoing services, the Company hereby authorizes (a) the negotiation and execution by Financo on behalf of the Company of confidentiality agreements (in each case, in such form as is directed by the Company) to be entered into by Approved Prospective Acquirors, and (b) the distribution of the Company Description to each Approved Prospective Acquiror that executes such a confidentiality agreement.

2. **Term of Engagement**

    Financo shall be engaged hereunder from the date hereof until this Agreement is terminated in accordance with the terms set forth below. Subject to the provisions of paragraphs 3 through 9 and the Exhibits attached hereto, which shall survive any termination of this Agreement and/or the completion of Financo's engagement hereunder, either party may terminate Financo's engagement hereunder at any time by giving the other party at least 10 business days prior written notice. Within 10 business days after the effective date of any termination, Financo will deliver to the Company a copy of the List as then constituted.

3. **Information from the Company**

    The Company shall (a) make available to Financo such information concerning the business, assets, operations and financial condition of the Company that Financo reasonably requests in connection with its services hereunder ("**Information**"), and (b) provide Financo with reasonable access to the Company's officers, directors, employees, accountants and other advisors and agents as Financo shall deem appropriate. The Company represents that all such Information furnished by it or on its behalf shall be true, complete and correct in all material respects and shall not contain any misstatement of material fact or omit to state any material fact required to be stated therein or necessary to make such statement not misleading. The Company recognizes and confirms that, in advising the Company and in completing its engagement hereunder, Financo is using and relying on such Information, as well as information furnished to it by other parties or available from generally recognized public sources. It is understood that, in performing under this Agreement, Financo (a) may assume and rely upon the accuracy and completeness of, and shall have no responsibility for independent verification of, such information, data and material, and (b) will not make any appraisal of the Company or any acquiror, or of any assets or liabilities of either, or of either's market competitors. The Company will promptly notify Financo if the Company learns of any material inaccuracy or misstatement in, or any material omission from, any information furnished by the Company or any of its agents or advisors to Financo.

4. **Compensation**

    - 4.1 **Minimum Commission**: The Company shall pay a minimum Sale commission fee to Financo of $150,000 (the "**Minimum Commission**"), payable in three equal installments of $50,000 each, the first of which shall be paid on the date hereof and the second and third of which shall be paid, except as provided bellow, on, respectively, the first and second monthly anniversary of the date hereof. If a closing of a Sale occurs prior to the payment of all Minimum Commission installments, the balance of the Minimum Commission shall be due on such closing.

Women's Apparel Group, LLC
July 15, 2011
Page 3

    4.2 **Additional Commission**: If (a) a Sale occurs either (i) with any party during the term of Financo's engagement hereunder, or (ii) with a party named on the List at any time during a period of 18 months following the effective date of the Company's termination of Financo's engagement hereunder, <u>and</u> (b) the Transaction Value reflected by such Sale exceeds the secured indebtedness of the Company held by Distinctive Apparel, Inc. (the "**DAI Indebtedness**"), then, upon such closing, the Company shall pay Financo an additional commission (the "**Additional Commission**") equal to 10% of the amount by which such portion of the Transaction Value reflected by such Sale exceeds the DAI Indebtedness.

    4.3 **Form of Payment**: Fees payable to Financo hereunder shall be paid by the Company to Financo by wire transfer or check payable in immediately available funds.

5. **Exclusivity**

The Company shall identify and refer to Financo the names of all parties, if any, with whom it has, during the term of Financo's engagement hereunder, discussion or contacts concerning a Sale, and each of such parties (whether or not disclosed to Financo) <u>shall automatically be deemed to be a Prospective Acquiror</u>.

6. **Expense Reimbursement**

Upon the execution hereof, the Company shall advance to Financo the amount of $2,500 (the "**Expenses Deposit**") as a deposit against the Company's obligation to reimburse Financo for any reasonable <u>direct out-of-pocket</u> expenses that it may incur in connection with or arising out of its activities under or contemplated by this engagement ("**Expenses**"). Each month during the term hereof, Financo shall deliver a statement outlining the Expenses incurred during the preceding month and the balance of the Expenses Deposit, if any, remaining available. At such point in time, if any, that aggregate Expenses incurred prior thereto reach the level of the Expenses Deposit, then – if the Company has consented in writing to exceeding such amount – thereafter, the Company, upon receipt of an invoice relating thereto, shall promptly reimburse Financo for Expenses incurred and not previously reimbursed. If, at such point in time as Financo's engagement hereunder is either terminated or completed, total Expenses incurred hereunder are less than the Expenses Deposit, then Financo shall thereupon remit to the Company the difference between the Expenses Deposit and such aggregate incurred Expenses. Expenses include, without limitation, reasonable fees and disbursements of Financo's outside counsel, travel and lodging expenses, outside database charges, communication charges, courier services, photocopying and document production costs, local transportation expenses when incurred by Company personnel or by Financo personnel after ordinary business hours, meal expenses when incurred during Company visits or by Financo personnel after ordinary business hours, and other necessary and reasonable expenses.

7. **Miscellaneous**

    7.1 <u>**Restrictions on Use of Financo Materials**</u>: Except as expressly provided for herein, all advice, analyses and written materials that Financo presents to the Company hereunder shall be prepared solely for the confidential use of the Company and its employees and advisors in connection with a Sale and for no other purpose and may not be disclosed or referred to publicly or to any third party, without Financo's prior written consent, other than to the extent reflected in meeting minutes of the Company's Board of Directors or as may be required by law or regulation.

Women's Apparel Group, LLC
July 15, 2011
Page 4

7.2 **Limitation of Financo Obligations**: This Agreement does not and will not constitute any agreement, commitment or undertaking, express or implied on the part of Financo or any affiliate to purchase or to sell any securities or to provide any financing, and does not ensure the successful arrangement or completion of any transaction.

Without limiting the foregoing, any advice, written or oral, rendered to the Company's Board of Directors or management in the course of the Company's engagement of Financo is solely for the purpose of assisting senior management or the Board of Directors of the Company, as the case may be, in evaluating a Sale and does not constitute a recommendation to any Company Stakeholder that such Stakeholder might or should take in connection with a Sale. Financo will not perform, directly or indirectly, solicitation services in connection with any transaction contemplated hereunder providing for the exchange of any security between the Company and its existing Stakeholders.

Further, in performing its services pursuant to this Agreement, Financo is not assuming any responsibility for the decision of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Sale or other transaction. Financo shall not have any obligation or responsibility to provide "crisis management" for or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements; nor shall Financo be responsible for providing any tax, legal or other specialist advice.

It is understood and agreed that nothing contained in this Agreement shall constitute an express or implied commitment by Financo or any of its affiliates to underwrite, place or purchase any securities in a financing or otherwise. Notwithstanding anything contained in this Agreement to the contrary, Financo makes no representations or warranties about the Company's ability to (i) successfully complete a Sale or (ii) satisfy its obligations in full or (iii) maintain sufficient liquidity to operate its business.

7.3 **Confidentiality**: Financo shall keep in confidence all confidential Company information, analyses and other materials that it acquires in connection with its activities hereunder ("**Information**") and shall not disclose Information to any third party; provided, however, that the term "Information" shall exclude information that (a) is or becomes generally available to the public other than as a result of any breach of this provision by Financo, (b) becomes available to Financo on a non-confidential basis from a source (other than the Company or any of its representatives) that has represented to Financo that such source is entitled to disclose it, (c) was within Financo's possession prior to its being furnished to Financo by or on behalf of the Company, provided that the source of such information was not known by Financo to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company with respect to such information, or (d) was independently developed by Financo without reference to the Information, provided such independent development can reasonably be demonstrated by Financo; and provided, further, that the foregoing shall not prohibit disclosures by Financo (i) pursuant to the exercise of its responsibilities hereunder, or (ii) required by law, legal process, or any judicial, administrative or self-regulatory agency or organization (provided prompt notice of such disclosures is given to the Company).

Women's Apparel Group, LLC
July 15, 2011
Page 5

7.4 **Independent Contractor:** Financo will act under this Agreement as an independent contractor and shall owe no fiduciary duty to the Company or any officer, director, employee or shareholder of the Company or any other person or entity. The Company expressly acknowledges that, except as expressly set forth in the Exhibits hereto, the Company's engagement of Financo is not intended to confer rights upon any person not a party hereto (including shareholders, employees or creditors of the Company) as against Financo, Financo's affiliates or their respective directors, officers, agents and employees or each other person, if any, controlling Financo or any of its affiliates. Any duties of Financo hereunder shall be contractual in nature and shall be owed solely to the Company and not to any officer, director, employee, or shareholder of the Company or any other person or entity.

7.5 **Announcement:** The Company agrees that, following the completion of any transaction contemplated hereby, Financo shall have the right, at its own expense, to create a "tombstone" describing its services to the Company hereunder, which tombstone may be placed in public periodicals and on Financo's website, as well as in "lucites" and wall plaques that may be distributed to participants in such transaction; provided that Financo shall obtain the Company's approval of any such tombstone prior to its release.

7.6 **Indemnity; Arbitration:** The Company agrees to the provisions of the Indemnification Agreement attached hereto as Exhibit A and the Arbitration Agreement attached hereto as B. All disputes between the parties hereto shall be resolved pursuant to the terms of such Arbitration Agreement (except that either party may avail itself of judicial process to enforce the application or enforcement of the Arbitration Agreement). Exhibits A and B are integral parts of this Agreement and the terms thereof are incorporated by reference herein, and each shall survive any termination, expiration or completion of Financo's engagement hereunder.

7.7 **Other Financo Activities:** Financo and its affiliates are engaged in the business of providing investment banking and financial advisory services and, therefore, nothing in this Agreement shall be construed to prohibit or limit the ability of Financo or its affiliates from pursuing, investigating, analyzing or engaging in investment banking, financial advisory and other business relationships with entities other than the Company, notwithstanding that such entities (a) may be engaged in a business which is similar to the business of the Company, (b) may have customers or potential customers similar or identical to the Company's, or (c) may have been or may be identified as potential merger or acquisition targets or potential candidates for some other business combination, cooperation or relationship, provided Financo discloses to the Company any potential conflicts of interest as soon as reasonably apparent to Financo and provided no such conflict materially interferes with the discharge by Financo of its duties hereunder. The Company expressly acknowledges and agrees that it does not claim any proprietary interest in the identity of any other entity in its industry or otherwise, and that the identity of all such entities is not "Information".

8. **Retention in Chapter 11 Proceedings**

The Company agrees that it will use best efforts to obtain prompt authorization from the Bankruptcy Court to engage Financo on the same terms and conditions set forth in this Agreement and under the provisions of Section 328(a) of the Code. The Company shall assist Financo with a draft of the retention application and proposed retention order authorizing Financo's engagement sufficiently in advance of the filing of such application and proposed order to enable such application to be presented as soon as practicable. Financo shall be under no obligation to provide any services under this agreement unless Financo's engagement under the terms of this Agreement is approved under section 328(a) of the Code by final order of the Bankruptcy Court (the "**Retention Order**"), which Retention Order is reasonably acceptable to Financo.

Women's Apparel Group, LLC
July 15, 2011
Page 6

In so agreeing to seek Financo's engagement, the Company represents that (a) it believes that Financo's general restructuring and transactional experience and expertise, its familiarity with the Company, its knowledge of the capital markets, and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Sale, (b) the value to the Company of Financo's services hereunder derives in substantial part from that expertise, familiarity and experience and, accordingly, (c) the structure and amount of the Advisory Fee and the Sale Incentive Fee are reasonable regardless of the number of hours to be expended by Financo's professionals in the performance of the services to be provided hereunder.

**It is agreed that the Retention Order shall provide that (a) Financo compensation that shall become due and payable hereunder and thereunder shall be (i) approved pursuant to Section 328(a) of the Code and shall only be subject to review thereunder, and (ii) afforded administrative priority under 11 U.S.C. § 503(b)(2) and 507(a)(2) and entitled to the benefits of any "carve-outs" for professional fees in effect in the Company's Chapter 11 case pursuant to one or more financing orders entered by the Bankruptcy Court, and (b) the requirements of Local Rule 2016-1 are modified so that Financo shall only be required to provide reasonable descriptions of the work it has performed (without detailed time records) and a list of professionals (and their qualifications) who provide services to the Company during the applicable period.**

9. **Governing Law; Jurisdiction; Entire Agreement; Amendments; Jury Waiver**

   This Agreement shall be deemed to have been made in the State of New York. This Agreement and all controversies arising from or relating to performance under this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to such State's rules concerning conflicts of laws.

   This Agreement constitutes the entire agreement between the parties hereto and supersedes and cancels any and all prior or contemporaneous arrangements, understandings and agreements, written or oral, between them relating to the subject matter hereof. This Agreement may not be amended or modified except in writing signed by all parties hereto. The failure of any party hereto to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof nor deprive that party of the right thereafter to insist upon strict adherence to that term.

   The parties hereto hereby agree that, except as expressly provided herein and in the Exhibits hereto, all claims or causes of action arising out of this Agreement may be heard and determined in any court of competent jurisdiction located within the County of New York, State of New York. Each of the parties hereto hereby consents to the service of process in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address set forth above, such service to become effective ten (10) days after mailing.

   EACH OF THE PARTIES HERETO (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS STOCKHOLDERS AND INDEMNIFIED PARTIES), WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERACTION (WHETHER BASED UPON CONTRACT OR OTHERWISE) RELATED TO OR ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE OF THE ADVISORY SERVICES CONTEMPLATED HEREUNDER.

   This Agreement shall be binding upon and inure to the benefit of any successors and assigns of the Company and Financo.

   This Agreement may be executed via electronic transmission and may be executed in separate counterparts, each of which shall be deemed to be an original and all of which together shall constitute a single instrument.

Women's Apparel Group, LLC
July 15, 2011
Page 7

If any portion of this Agreement shall be held or made unenforceable or invalid by a statute, rule, regulation, decision of a tribunal or otherwise, the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect, and, to the fullest extent, the provisions of the Agreement shall be severable.

Each of the parties hereto represents and warrants that it has full power and authority to execute and deliver this Agreement and to assume its obligations set forth herein, and this Agreement has been duly authorized, executed and delivered by such party and constitutes a valid, binding and legally enforceable obligation of such party, except (i) as may be limited by laws pertaining to bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other laws affecting creditors' rights generally, and (ii) as may be limited by laws governing specific performance, injunctive relief and all other equitable remedies.

If the foregoing correctly sets forth the understanding and agreement between Financo and the Company, please sign in the space indicated below.

ACCEPTED AND AGREED TO:

FINANCO, INC.

By: _____

Lee Helman, Managing Director

WOMEN'S APPAREL GROUP, LLC

By: _____

Steven Lightman, CEO

## SCHEDULE I

### DEFINITIONS

**Aggregate Consideration** shall be defined as the sum of all cash, cash equivalents, Deferred Consideration, Securities Consideration, and Non-Cash Consideration paid or payable, directly or indirectly, by a third party in connection with a Sale.

An **Asset Sale** shall consist of a Sale effected through a purchase or sale of Company assets (which may include assumption of Company liabilities).

**Deferred Consideration** shall consist of the Present Value of any portion of Sale consideration that is payable at any time following the consummation of such Sale, including contingent, escrowed and installment consideration and any forms of promissory notes.

An **Equity Sale** shall consist of a Sale effected through a purchase, sale, exchange or merger involving Company equity securities.

**Existing Obligations** shall consist of the Company's existing outstanding capital (including, without limitation, equity securities, bank debt, debt instruments, bonds, joint ventures or partnership interests, capital or operating lease obligations, trade credits, pension and other employee benefit obligations, other contract obligations and any other on- and off-balance sheet obligations, and other similar liabilities.

**Extraordinary Dividends** shall consist of dividends, redemptions or similar distributions paid by the Company from the date hereof through the closing of any Sale that are out of the ordinary course (other than, where applicable, distributions required for shareholders to meet income tax obligations).

A **Hybrid Liquidation** shall consist of one or more liquidations of Company assets (conducted either by the Company itself or on its behalf by a third party) when not effected in connection with the Company's cessation of operations.

The term **Indebtedness for Money Borrowed** shall include all interest-bearing and zero coupon debt, as well as proceeds from factored assets ("factor proceeds"), except that the measure of short-term revolving working capital debt and factor proceeds shall be the average outstanding amount of such debt or factor proceeds for the twelve months preceding such Sale. Indebtedness of the Company for Money Borrowed shall be **Assumed** in a Sale if either (x) in an Equity Sale, such indebtedness is an obligation of the Company both before and after the consummation of such Sale, (y) in an Asset Sale, such indebtedness is assumed directly or indirectly by an acquiring party, or (z) such indebtedness is otherwise extinguished in connection with such Sale.

**Non-Cash Consideration** shall consist of contractual arrangements and other non-cash property (excluding Securities and Deferred Consideration). The value of any Non-Cash Consideration in any Sale shall be determined as provided in the definitive agreement governing such Sale or, in the absence of such an agreement or provision, as the fair market value thereof as reasonably mutually determined in good faith by the Company and Financo prior to the closing of such Sale.

The **Present Value** of any amount referenced herein shall be calculated utilizing a discount rate equal to the prime rate published in The Wall Street Journal on the fifth (5th) business day preceding the expected closing date of the Sale, except in the case of Contingent Consideration, where it shall be as reasonably mutually determined in good faith by Financo and the Company prior to the closing of such Sale.

Company: _____

Financo: _____

A **Primary Liquidation** shall consist of a liquidation of all or substantially all of the Company's assets conducted either by the Company itself or on its behalf by a third party.

A **Recapitalization** shall consist of a recapitalization, restructuring, reorganization or any similar financial or structural restructuring of the Company effected, directly or indirectly (whether within or outside of a Chapter 11 proceeding), through one or a series of transactions, including without limitation through: spin-offs; split-offs; purchases, transfer, assumptions or settlement of the Company's securities, assets, liabilities, obligations or claims (whether secured or unsecured); one or more extraordinary dividends; foreclosure; or any transaction or series of transactions that functionally effect a Sale through a recapitalization or restructuring.

A **Sale** involving the Company shall, except as expressly provided below, consist of any transaction or series, combination of or multiple transactions (whether effected by parties acting in concert or independently), effecting (whether or not pursuant to Chapter 11 of the Code), directly or indirectly, (a) an sale, merger, consolidation, or other business combination pursuant to which the business or assets of the Company are, directly or indirectly. combined with another company; (b) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof, constituting a significant portion of the then outstanding stock of the Company or possessing a significant portion of the then outstanding voting power of the Company; (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of material assets, securities (including, without limitation, equity securities, debt securities and executory contracts) or other interests of the Company; (d) the formation of a joint venture, strategic alliance or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of an interest in the Company to a third party; (e) a lease of assets (with or without a purchase option); (f) a Primary or Hybrid Liquidation; (g) a tender or exchange offer; (h) a leveraged buy-out; or (i) such other similar form of transaction.

**Stakeholders** of the Company shall include all holders of the Company's Existing Obligations.

**Transaction Value:**

**Transaction Value of the Company in a Sale** shall mean (as clarified by the next two subparagraphs) the value of 100% of the Company's value as implied through the consideration for such Sale, calculated as the sum of the following:

(A) Aggregate Consideration divided by the percentage of the Company transferred (where such percentage can be measured as the portion of assets transferred or equity transferred, as may be applicable); and

(B) any of the Company's Indebtedness for Money Borrowed that is Assumed in connection with such Sale; and

(C) all Extraordinary Dividends.

Company: _____

Financo: _[signature]_

**Transaction Value in a Sale Effected through a Recapitalization**: If the Company effects a Sale through a Recapitalization, Transaction Value <u>will include</u> (without duplication of any other component of Transaction Value) the value (as determined by the terms of such Sale) of all consideration directly or indirectly received by (or provided for the benefit of) any Stakeholders of the Company and/or any of its subsidiaries or affiliates (including without limitation shareholders, creditors, customers and/or vendors), which may include some or all of the following (without limitation): cash or cash equivalents; securities; the amount of liabilities or obligations of the Company (whether secured or unsecured) that are assumed or settled (or agreed to be assumed or settled) on behalf of the Company; or consideration received or retained by such Stakeholders in connection with such Recapitalization in exchange for or in respect of securities, liabilities or obligations (whether secured or unsecured) of, or claims against, the Company.

**Transaction Value in a Sale Effected as a Multi-Step Transaction**: If the Company effects such Sale as a multi-step transaction whereby the Company sells its principal operating components to one purchaser, with other assets (e.g., cash, investments, inventories and/or receivables) being either retained by the Company, liquidated, or sold to third parties, then the value of such retained, liquidated or sold assets shall be counted as part of the Transaction Value of such Sale, as follows (but without duplication of any other component of Transaction Value): if such retained assets are sold to third parties or liquidated to the public within six (6) months thereafter, the Transaction Value shall include the proceeds of such sale or liquidation; if such assets are not divested, the Transaction Value shall include the following: (i) the face value of all retained cash and cash equivalents, (ii) the book value of all retained inventories and receivables, and (iii) the fair market value of all other retained assets (including investments).

**Securities Consideration** shall consist of securities and the value thereof shall be determined as provided in the definitive agreement governing such Sale or, in the absence of such an agreement or provision (or as requires clarification), as follows:

> In the case of a Sale involving an exchange of securities where the number of securities of the acquiror to be received by the Company or its Stakeholders will vary in a manner designed to produce a fixed value to be received in exchange for each security of the Company, the value thereof shall be determined by the maximum number of securities of the Company to be exchanged in such Sale multiplied by the value per share specified in the definitive agreement governing such Sale.

> In the case of a Sale involving an exchange of securities where the number of securities of the acquiror to be received in exchange for each security of the Company is fixed and the value of such securities may vary, the value shall mean (A) for securities traded on a national securities exchange or the NASDAQ National Market System, the average closing price of the securities for the 20 trading days ending on the fifth trading day prior to the closing of such Sale multiplied by the number of securities of the acquiror to be issued upon exchange of the Company's securities in such Sale, and (B) for securities quoted by a national quotation service, the average of the closing bid and ask prices of the securities for a period of 20 trading days ending on the fifth trading day prior to the closing of such Sale multiplied by the number of securities of the acquiror to be issued in such Sale.

> For any other securities, the value shall mean the fair market value as reasonably mutually determined in good faith by Financo and the Company prior to the closing of such Sale, provided, that if such securities are promissory notes, the securities shall be valued at face value.

Accepted and Agreed To This 15th Day of July, 2011

| FINANCO, INC. | WOMEN'S APPAREL GROUP, LLC |
|---|---|
| By: _____ | By: _____ |
| Lee Helman | Steven Lightman |
| Managing Director | CEO |

## INDEMNIFICATION AGREEMENT

In connection with the Engagement Agreement (the "**Engagement Agreement**") dated the date hereof between Financo, Inc. (together with all affiliates, as defined in Rule 405 under the Securities Act of 1933, as amended, "**Financo**"), and [Company Name] (the "**Company**"), the Company shall indemnify and hold harmless Financo and any of its controlling persons, directors, officers, employees or agents, and each of their respective successors and assigns (each, including Financo, an "**Indemnified Party**"), from and against any losses, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards, other liabilities (joint or several), and costs, fees and expenses incurred by them, including Legal Costs, as defined below (collectively, "**Losses**"), arising from any lawsuits, claims or proceedings (and any appeals therefrom), including, without limitation, stockholder actions (collectively, "**Actions**"), (i) related to or arising out of (A) oral or written information provided by the Company, the Company's employees or other Company agents, which either the Company or Financo provides to any persons, or (B) other action or failure to act by the Company, the Company's employees or other Company agents, or by an Indemnified Party at the Company's request or with the Company's consent, or (ii) otherwise related to or arising out of the engagement of Financo under the Engagement Agreement or any transaction or conduct in connection therewith (including, without limitation, any Losses arising out of or resulting from the sole or concurrent negligence, strict liability or vicarious liability of any Indemnified Party), provided that this clause (ii) shall not apply to the extent it is finally judicially determined by a court of competent jurisdiction that such Losses arose out of the gross negligence or bad faith of such Indemnified Party (a "**Fault Ruling**"). If multiple Actions are brought against an Indemnified Party, with respect to at least one of which indemnification is permitted under applicable law and provided for under this agreement, the Company agrees that any award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the holding in such Action expressly states that the award, or any portion thereof, is based solely on a claim as to which indemnification is not available. The Company agrees that the Company's commitments set forth herein shall apply whether or not such Indemnified Party is a named party to any such Actions. In no event shall the Indemnified Parties' aggregate liability to the Company exceed the fees Financo receives from the Company under the Engagement Agreement, except and only to the extent a Fault Ruling holds that such excess liability is the fault of an Indemnified Party.

If indemnification is to be sought hereunder by an Indemnified Party, then such Indemnified Party shall notify the Company of the commencement of any Action in respect thereof; provided, however, that the failure so to notify the Company shall not relieve the Company from any liability that it may otherwise have to such Indemnified Party, except to the extent that such failure causes actual harm to the Company or prejudices its ability to defend such Action on behalf of such Indemnified Party. Following such notification, the Company may elect in writing to assume the defense of such Action (a "**Company Defense Election**"), provided that an Indemnified Party may employ counsel to participate in the defense of any such Action so long as, except as provided below, the employment of such counsel shall be at the Indemnified Party's own expense. Upon any Company Defense Election, (a) the Indemnified Party shall cooperate with such defense in all reasonable manners, provided that the Company shall reimburse such Indemnified Party for all reasonable and necessary out-of-pocket expenses it incurs in connection with such cooperation (after having first provided the Company with an opportunity, where practicable, to provide for such costs), and (b) the Company shall not be liable for any Legal Costs subsequently incurred by such Indemnified Party (other than reasonable costs of investigation that can not be practicably effected by the Company or counsel) in connection therewith, unless (i) the Company has failed to provide counsel reasonably satisfactory to such Indemnified Party in a timely manner or (ii) the named parties to any such Action (including any impleaded parties) include both such Indemnified Party and the Company and such Indemnified Party shall have been advised by its counsel that either there may be one or more legal defenses available to it which are different from or in addition to those available to the Company or that a conflict or potential conflict exists (between the Indemnified Party and the Company that makes it impossible or inadvisable for counsel to the Indemnified Party to conduct the defense of both the Company and the Indemnified Party. If the Company does not effect a Company Defense Election, or if it does so, but such counsel is not available for the reasons set forth in clauses (i) or (ii) in the immediately preceding sentence, then the Company shall reimburse such Indemnified Party promptly for its Legal Costs, as they are incurred, with respect to all Actions. In any Action, the Company shall not be responsible for the fees and expenses of more than one counsel (in addition to local counsel) for all Indemnified Parties in any one jurisdiction, unless any of such Indemnified Parties has a separate and conflicting defense with regard to such Action, as reasonably determined by counsel that has been provided by the Company. "**Legal Costs**" shall consist of any reasonable legal or other fees or expenses incurred (i) in investigating, preparing for, defending or pursuing any Action or threat thereof, whether or not any Indemnified Party is a party to such Action, and (ii) when enforcing such Indemnified Party's rights under this agreement. If there is a Fault Ruling, such Indemnified Party will promptly remit to the Company previously reimbursed Legal Costs proportional to the percentage of such Indemnified Party's fault determined by the Fault Ruling.

The Company shall not be liable for any settlement of any Action effected without its prior written consent, which consent shall not be unreasonably withheld. The Company agrees that it will not, without the prior written consent of Financo (which shall not be unreasonably withheld), settle or compromise or consent to the entry of judgment with respect to any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not an Indemnified Party is an actual or contemplated party to such Action), unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such Action.

In the event that an Indemnified Party is requested or required to appear as a witness (including through deposition) in any Action brought by or on behalf of, or against, the Company in which such Indemnified Party is not named as a defendant, the Company agrees to reimburse Financo or the Indemnified Party, as the case may be, for all expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel.

If for any reason (other than with respect to a Fault Ruling) the indemnification contained herein is held by a court to be unavailable to an Indemnified Party or insufficient to hold any Indemnified Party harmless in respect of any Losses (or Action in respect thereof), then the Company and Financo shall contribute to the amount paid or payable by any Indemnified Party as a result of Loss (i) in such proportions as it appropriate to reflect the relative benefits received by the Company on the one hand, and Financo on the other hand, in connection with Financo's engagement referred to above, and (ii) if (and only if) the allocation provided for in clause (i) is not permitted by applicable law, in such proportion to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company and Financo with respect to such Loss and any other relevant equitable considerations; provided that Financo's obligation to make such contribution will not exceed under any circumstances the amount of fees actually received by Financo under the Engagement Agreement. The relative benefits of the Company, on the one hand, and Financo, on the other hand shall be deemed to be in proportion to (a) the total value paid or proposed to be paid or received or proposed to be received by the Company or its stockholders pursuant to the transaction, whether or not consummated, for which Financo is engaged to render financial advisory services bears to (b) the fee paid or proposed to be paid to Financo in connection with the Engagement Agreement. The relative fault of the Company, on the one hand, and Financo, on the other hand, shall be determined by references to, among other things, the parties' relative intent, knowledge, access to information and opportunity to correct or prevent the alleged act, statement or omission giving rise to such Loss. The Company and Financo agree that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above. The amount paid or payable by an Indemnified Party as a result of the Losses (or Actions in respect thereof) referred to above shall be deemed to include any legal or other expenses incurred by such Indemnified Party in connection with investigation or defending any such claim.

The provisions of paragraph 9 of the Engagement Agreement are incorporated by reference and shall govern this agreement regardless of any modification or termination of the Engagement Agreement. The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise. Except as otherwise expressly provided for in this agreement, if any term, provision, covenant or restriction contained in this agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. The obligations of the Company set forth herein shall apply to any modification of the Engagement Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Party's services under or in connection with, the Engagement Agreement.

Notwithstanding the foregoing, nothing contained in this agreement shall limit any claims the Company may have with respect to Financo's breach of the Engagement Agreement.

ACCEPTED AND AGREED TO THIS 15TH DAY OF JULY, 2011

FINANCO, INC.                                          WOMEN'S APPAREL GROUP, LLC

By: _____                             By: _____

Lee Helman - Managing Director                         Steven Lightman - CEO

## ARBITRATION AGREEMENT

Reference is hereby made to the engagement agreement dated the date hereof by and between Financo, Inc. (together with all affiliates, the "**Advisor**") and [Company Name] (the "**Company**") pursuant to which the Company has engaged the Advisor to advise and assist the Company in connection with the matters referred to in such agreement, including the Indemnification Agreement attached thereto as Exhibit A (collectively, the "**Engagement Agreement**"). The Company and the Advisor hereby agree that any controversy or dispute between them and any claim made by one of them against the other shall be resolved by binding arbitration in accordance with the terms of this agreement (the "**Arbitration Agreement**"), including without limitation: (a) claims arising out of contract or tort, and (b) disputes relating to the interpretation, applicability, enforceability or formation of the Engagement Agreement generally or this Arbitration Agreement, including, but not limited to any claim that all or part of the Engagement Agreement generally or this Arbitration Agreement is void or voidable for any reason, including but limited to that it is a contract of adhesion, fails for lack of consideration, is procedurally or substantively unconscionable or is void as against public policy.

All arbitrations hereunder shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures (including Rule 28 thereunder concerning "**Final Offer**" arbitration, as amended hereby and attached hereto as Annex 1), as modified or supplemented in this Arbitration Agreement. Any party hereto (the "**Disputing Party**") seeking to commence such an arbitration shall deliver written notice of such intent (the "**Arbitration Notice**") to the other party (the "**Receiving Party**") together with its demand for arbitration (a "**Demand for Arbitration**"), by courier, hand-delivery or certified mail. The parties shall have ten (10) business days after the Receiving Party's receipt of the Arbitration Notice and the Demand for Arbitration (the "**Arbitrator Selection Period**") to select an arbitrator mutually acceptable to each party to arbitrate the dispute between the parties. Failing agreement by the parties on selection of an arbitrator during the Arbitrator Selection Period, the arbitrator shall be appointed by the New York City office of JAMS from a list of arbitrators maintained by such office who meets the requirements set out herein. The arbitrator chosen shall (A) be a neutral person, (B) have no prior relationship with or performance of any services for either party and (C) agree to conduct the arbitration and render a decision within the time period and in accordance with the procedures established by this agreement. In the event that any arbitrator selected hereunder is unable to serve, his or her replacement will be selected in the same manner. The arbitrator shall be instructed that time is of the essence in the arbitration proceeding. The arbitrator shall agree to render his or her judgment and/or award within thirty (30) days following his or her appointment or such reasonably later date that is practicable in consideration of his or her availability.

Upon appointment, the arbitrator shall promptly convene a conference among the arbitrator and the parties to set a schedule providing for the prompt presentation and exchange by the parties of a written outline of their positions and any supporting correspondence, memoranda and documentation to the extent consistent with the purpose of the arbitration. The arbitration hearing shall be commenced promptly and conducted expeditiously, with each party each being allocated one-half of the time for the presentation of its case (including examination of witnesses). Unless otherwise agreed to by the parties or as required by the arbitrator, an arbitration hearing shall be conducted on consecutive days. All proceedings before the arbitrator shall be confidential and neither party shall comment to any third party on the arbitration or subject matter thereof except as required to permit the conduct of the arbitration. The arbitration shall be held in New York County, New York State (unless the parties mutually agree in writing on another location). Further, on all matters subject to arbitration hereunder, the arbitrator shall limit his or her decision to the issue(s) presented by the parties based on the written information submitted and the presentation made by the parties at the arbitration. The arbitrator will have no power or authority to amend or disregard any provision of this Arbitration Agreement, except to the extent required by applicable law. The arbitrator shall not have authority to award punitive or other non-compensatory damages to either party (other than expense reimbursements).

The parties agree to accept the decision and award of the arbitrator, and agree that such decision and award shall be final and binding on the parties, and judgment thereon may be entered in any court of competent jurisdiction. The arbitrator shall award to the prevailing party in the arbitration the cost of such prevailing party's reasonable attorneys' fees, arbitration expenses and other expenses reasonably incurred in connection with the dispute or disputes being reviewed by the arbitrator. Furthermore, (a) if a party files a judicial action to either enforce application of the terms hereof or to collect an award hereunder, the other party will pay the filing party's reasonable costs and expenses associated therewith, including attorneys' fees, and (b) if a party files a judicial action alleging claims subject to arbitration under this agreement, and the other party successfully stays such judicial action and/or compels arbitration of the claims, the party bringing the claims in court will pay the other party's reasonable costs and expenses, including attorneys' fees.

ACCEPTED AND AGREED TO THIS 15TH DAY OF JULY, 2011

FINANCO, INC.

By: _____

Lee Helman – Managing Director

WOMEN'S APPAREL GROUP, LLC

By: _____

Steven Lightman - CEO

ANNEX 1 TO ARBITRATION AGREEMENT

### Rule 28 of the JAMS Streamlined Arbitration Rules and Procedures: "Final Offer" (or Baseball) Arbitration Option

The following sets forth the rules for application of JAMS "Final Offer" arbitration, as amended by agreement of the parties hereto.

(a) At least seven (7) calendar days before the arbitration hearing, the Parties shall exchange with each other and provide to JAMS written proposals for the amount of money damages they would offer or demand, as applicable, and that they believe to be appropriate based on the terms, provisions and governing law of the Engagement Agreement.

(b) JAMS shall promptly provide a copy of the Parties' proposals to the Arbitrator. At any time prior to the close of the Arbitration Hearing, the Parties may exchange revised written proposals or demands, which shall supersede all prior proposals. The revised written proposals shall be provided to JAMS, which shall promptly provide them to the Arbitrator. In rendering the Award, the Arbitrator shall choose between the Parties' last proposals, selecting the proposal that the Arbitrator finds most reasonable and appropriate in light of the standards set forth in Rule 19(b) of the Streamlined Arbitration Rules. This Rule 28 modifies Rule 19(f) of the Streamlined Arbitration Rules in that no written statement of reasons shall accompany the Award.

(c) Other than as provided herein, the provisions of Rule 19 of the Streamlined Arbitration Rules shall be applicable.

ACCEPTED AND AGREED TO THIS 15TH DAY OF JULY, 2011

FINANCO, INC.

By: _____

Lee Helman
Managing Director

WOMEN'S APPAREL GROUP, LLC

By: _____

Steven Lightman
CEO

# P R I V A C Y   N O T I C E

Financo, Inc. and its affiliates, including Financo Securities LLC, the registered broker-dealer affiliate of Financo, Inc. (collectively and alternatively, "we", "us", "our" or "Financo") seek to maintain the highest standards of confidentiality to safeguard the privacy of our clients (each, a "Client").  We are providing this Privacy Notice to all our Clients who obtain financial services or products from us, in accordance with Title V of the Gramm-Leach-Bliley Act of 1999 and its implementing regulations.

## Information About Individuals Associated with a Client

The non-public personal information we may retain about any individual associated with you ("Information") comes primarily from any engagement agreements, due diligence, e-mails, or other documents that a Client may submit to us.  We may also internally record Information about Client experiences with us, our affiliates, and others relating to the services or products we provide.

## Our Privacy Policies

We do not disclose Information to anyone, except as permitted by law.  Thus, we may share Information (a) with our affiliates, in order to bring a Client the full range of services and products available from the Financo, and (b) with non-affiliated companies, in order to process Client transactions with us or our affiliates or to perform other support services for your account.  Additionally, we may disclose Information if a Client gives its specific consent or instruction to us, or if the disclosure is required by law or regulations.  Our privacy policy applies to current and former Clients, as well as potential Clients.

## Our Internal Information Security

We limit access to Information to those of our staff and service providers who are involved in offering or administering the services and products that we offer.  We maintain physical, electronic, and procedural safeguards designed to comply with federal standards to protect Information.  We value our relationship with each Client and want to assure you that maintaining each Client's privacy is important to us.  If you have any question, please call Edward McCabe – the Chief Compliance Officer of Financo Securities LLC – at 212-593-7385.