UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

| | |
|---|---|
| In re: ) | |
| ) | |
| WOMEN'S APPAREL GROUP, LLC ) | Chapter 11 |
| ) | Case No. 11-16217 (JNF) |
| Debtor. ) | |

## NOTICE OF (I) INTENDED SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ANY LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (II) DEADLINES AND PROCEDURES FOR SUBMITTING OBJECTIONS, COUNTEROFFERS, OR BIDS, AND (III) HEARING DATE

**PLEASE TAKE NOTICE** that on July 15, 2011, Women's Apparel Group, LLC, the above captioned debtor and debtor-in-possession (the "Debtor") filed its Motion Requesting (I) Approval of (A) Asset Purchase Agreement And Authorizing The Sale of Substantially All of The Debtor's Assets Outside The Ordinary Court of Business, Free And Clear of All Liens, Claims, Interests And Encumbrances, And Subject to Competing Offers; and (B) Bid And Auction Procedures; And (II) Related Relied as supplement and revised by that certain Motion Requesting (I) Approval of (A) Order Approving Bid Procedures for Sale of Debtor's Assets; (B) Bid Procedures; (C) Notice of Sale; And (D) Form of Asset Purchase Agreement with Stalking Horse Bidder; And (II) Related Relief dated August 21, 2011 (collectively the "Motion"). Pursuant to the Motion, under 11 U.S.C. § 363, Fed. R. Bankr. P. 2002(a)(2) and 6004, and MLBR 2002-5 and 6004-1, the Debtor seeks to sell substantially all of its assets free and clear of any and all liens, claims, encumbrances. and interests, of any kind or nature whatsoever[1], by a sale to Distinctive Apparel, Inc. ("DAI") under the terms of an Asset Purchase Agreement dated August 22, 2011 ("APA") or to a higher or better bidder pursuant to the procedures outlined below.

**PLEASE TAKE FURTHER NOTICE** that on August 22,2011, pursuant to the Motion, the United States Bankruptcy Court for the District of Massachusetts (the "Court") entered an order (the "Procedures Order") approving the Debtor's proposed bidding procedures and expense reimbursement of DAI (the "Bid Procedures") in connection with the proposed sale at an auction (the "Auction") to be conducted at **Courtroom 1, 12th Floor, 5 Post Office Square, Boston, MA 02109 on September 12, 2011 at 10:00 a.m.** All interested parties may attend the Auction.

---

[1] Notwithstanding the forgoing, nothing in this Order, shall be deemed to limit the obligation of any party, including but not limited to the Successful Bidder (as defined below), to bargain in good faith with the collective bargaining representative of the employees of WAG in accordance with the National Labor Relations Act, as amended, 29USC §151 et seq..

A copy of the Motion, the Procedures Order and the Bid Procedures can be obtained by requesting same from the Debtor's counsel at the address set forth below.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Procedures, the Debtor is soliciting alternative buyers (each, a "Potential Bidder") for the assets that are subject of the APA. A Potential Bidder shall deliver to the Debtor's counsel and counsel for the Committee a signed confidentiality agreement and evidence of such Potential Bidder's financial capacity.

**PLEASE TAKE FURTHER NOTICE** that to be a Qualified Bidder entitled to participate at the Auction, each Potential Bidder shall submit a bid in accordance with the Bid Procedures by facsimile and/or email to ((i) counsel to the Debtor, Nutter McClennen & Fish LLP, Seaport West, 155 Seaport Boulevard, Boston, MA 02210 (Fax: (617) 310-9563; E-mail: RRosenstein@nutter.com); (ii) counsel to the Creditors' Committee, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178 (Fax: (212) 808-7897 – Attn: Eric R. Wilson, Esq. and Jason R. Adams, Esq., E-mail: ewilson@kelleydrye.com, jadams@kelleydrye.com); and (iii) to the of the United States Trustee, John. W. McCormack Post Office and Court House, 5 Post Office Square, Suite 1000 Boston, MA 02109-3945 (Fax: (617) 565-6368; E-Mail: paula.bachtell@usdoj.gov) (collectively the "Notice Parties") by 4:30 p.m. (Eastern Time) on September 8, 2011 (the "Bid Deadline"). No bid shall be considered by the Debtor and the Committee unless it complies with the requirements set forth in the Bid Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtor is not seeking to assume or assign any executory contracts or unexpired leases at this time but reserves the right to seek to assume or assign executory contracts or unexpired leases in the future, on notice to the counterparties to such agreements

**PLEASE TAKE FURTHER NOTICE** that the Debtor shall request that the assets to be sold as provided in the APA will be sold free and clear of all liens, claims, encumbrances, and interests, to the fullest extent permitted under 11 U.S.C. §363, with perfected, enforceable, valid liens to attach to the proceeds of the sale to the same extent, with the same validity, and in the same order of priority as existed under applicable law[2].

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider the Sale Motion and approval of the sale of assets in accordance with the APA to the DAI, or to any other successful bidder, is scheduled to take place before the Honorable Joan N. Feeney, on September 12, 2011 after completion of the Auction as the United State Bankruptcy Court sitting in Boston at the John W. McCormack Post Office and Curt House, 5 Post Office Square, Boston, Ma 02109 in Court Room 1 (the "Sale Hearing").

**PLEASE TAKE FURTHER NOTICE** that any objections to the Sale Motion and/or the sales of assets contemplated thereby must (a) be in writing; (b) state the legal and factual basis for such objection; and (c) be filed with the Clerk of Court, United States Bankruptcy Court, John W. McCormack Post Office and Court House, 5 Post Office Square, Suite 1150 Boston, MA 02109-3945 and be served on the Notice Parties so as to be actually received by September 8, 2011 at 4:30pm (the "Objection Deadline").

---

[2] SEE FOOTNOTE 1

**PLEASE TAKE FURTHER NOTICE** that, if no Qualified Bids are submitted by the Bid Deadline and no objections to the Sale Motion are filed by the Objection Deadline, the Court, in its discretion, may cancel the scheduled Auction and Sale Hearing and approve the sale contemplated thereby without further notice or hearing.

Dated: Boston. Massachusetts
August 22, 2011

Respectfully submitted,

WOMEN'S APPAREL GROUP, LLC
By its counsel,
/s/ Richard S. Rosenstein
Richard S. Rosenstein (BBO #429100)
NUTTER, MCCLENNEN & FISH, LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2563

rrosenstein@nutter.com

3

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| WOMEN'S APPAREL GROUP, LLC | Case No. 11-16217 (JNF) |
| Debtor. | |

**ORDER APPROVING BID PROCEDURES
AND GRANTING RELATED RELIEF**

This matter coming before the Court on Debtor's Motion Requesting (I) Approval Of (A)

Order Approving Bid Procedures For Sale Of Debtor's Assets; (B) Bid Procedures; (C) Notice

Of Sale; And (D) Form Of Asset Purchase Agreement With Stalking Horse Bidder; And (II)

Related Relief (the "Motion") seeking approval by this Court of the Bid Procedures appended

hereto as **Exhibit I** (the "Bid Procedures"), the process for solicitation of bids for the Debtor's

assets, the form of notice of the proposed sale of the Debtor's assets in the form of the Notice of

Sale appended hereto as **Exhibit II** (the "Sale Notice"), scheduling an auction, and scheduling a

hearing to consider approval of the sale pursuant to 11 U.S.C. § 363 (collectively the "Auction

Process") and approval of the form of Asset Purchase Agreement with the Debtor as Seller and

Distinctive Apparel, Inc. as Buyer (Distinctive Apparel, Inc, being hereinafter referred to as the

"Stalking Horse Bidder") appended hereto as **Exhibit III** ("Form of APA"); the Court having

reviewed the Motion and having heard the statements of counsel in support of the relief

requested at a hearing before the Court and any objections to the relief so requested (the

"Hearing"); the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and (c)

notice of the Motion (and service of the proposed order) was sufficient under the circumstances; and the Court having determined that the legal and factual bases set forth in the Motion for the approval of Auction Process and at the Hearing establish just cause for the relief herein granted;

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    This Court has jurisdiction over this matter and over the property of the Debtor and its bankruptcy estate pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).

B.    Under the circumstances and in light of the relief requested in the Motion, requisite notice of the Motion and the relief requested thereby and this Order has been provided in accordance with Bankruptcy Rules 4001(c) and (d) and 9014, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, Bankruptcy Code § 102(1), and not further notice of, or hearing on, the Motion or this Order is necessary or required.

C.    The Debtor has articulated good and sufficient reasons for, and the best interests of its estate will be served by, this Court granting the relief requested in the Motion as set forth in this Order, including scheduling an Auction, approving the use of the Form of APA as part of the Bid Procedures and Auction Process and considering approval of the proposed sale and the transfer of the Acquired Assets to the Successful Bidder free and clear of all liens, claims, interests and encumbrances pursuant to sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing provided for in the Bid Procedures and Notice of Sale.  Notwithstanding the forgoing, nothing in this Order, shall be deemed to limit the obligation of any party, including but not limited to the Successful Bidder (as defined below), to bargain in good faith with the collective bargaining representative of the employees of WAG in accordance with the National Labor Relations Act, as amended, 29USC §151 et seq.

2

D.     The Debtor has requested that this Court limit the scope and shorten the time provided in Bankruptcy Rule 2002(a)(2) for notice of the proposed sale and have shown that there is cause to limit such notice as to scope and time as provided in this Order by providing that consumer creditors of the Debtor not receive notice in order to avoid disruption of the Debtor's business and to shorten the time for such notice in order to allow the Debtor to conduct an expedited sale process while continuing as a going concern.

E.     The Debtor's proposed notices, as modified for cause shown, of (i) the Auction Process, (ii) the Form of APA and the terms contained therein, (iii) the Bid Procedures, and (iv) the proposed procedures for assumption and assignment of executory contracts and leases as provided in the Form of APA, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, the Auction, the Auction Process, the assumption and assignment, if required by any Successful Bidder, of executory contracts and leases, the Purchase Agreement and the Bid Procedures to be employed in connection therewith.

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED approving the Auction Process to the extent provided herein.

2.     The Bid Procedures attached hereto as **Exhibit I** are approved, are incorporated herein by reference, and shall govern all bids and bid proceedings related to the Acquired Assets. The Debtors and the Committee are authorized to take any and all actions necessary to implement the Bid Procedures.[1]

---

[1]     Nothing in this Order approving the Bid Procedures, the Notice of Sale or the Form of APA shall be deemed to limit the obligation of any party, including but not limited to the Successful Bidder (as defined in the Bid Procedures), to bargain in good faith with the collective bargaining representative of the employees of the Debtor in accordance with the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq.

3.      The form of Notice of Sale attached hereto as **Exhibit II** is approved.  No later than ~~three~~ (2) business days after entry of this Order, the Debtor will cause the Notice of Sale to be sent by first-class mail, postage prepaid, to (i) all of the Debtor's creditors and interest holders, other than consumer creditors of the Debtor, (ii) the Environmental Protection Agency, (iii) the state/local environmental agencies in the jurisdictions where the debtor owns or leases real property, (iv) all entities known to have expressed a bona fide interest in acquiring all or a portion of the Acquired Assets, (v) all taxing authorities or recording offices which have a reasonably known interest in the relief requested, (vi) the office of the United States Trustee, (vii) all federal, state and local regulatory authorities with jurisdiction over the Debtor, (viii) the office of the United States Attorney, (ix) all insurers of the Debtor, (x) all non-debtor parties to the Debtor's executory contracts and leases, (xi) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets, (xii) all know parties-in-interest in the Debtor's case; and (xiii) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002.

4.      No later than ten (10) days after the date of this Order, the Debtor shall file with the Court the names of all of the prospective bidders of the Acquired Assets that FINANCO, Inc., the investment advisor hired to facilitate the sale, has contacted about the proposed sale.

5.      The Form of APA shall be made available in the form appended hereto as **Exhibit III**, as provided in the Bid Procedures.

6.      The Expense Reimbursement to be paid to the Stalking Horse Bidder, under the circumstances described in the Purchase Agreement is (i) an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code; and (ii) reasonable and appropriate in light of the nature of the proposed sale.

4

7.     The Debtor is authorized to proceed with the Auction Process, as provided in the Bid Procedures, including noticing the proposed sale, soliciting competing bids and conducting the Auction on September 12, 2011 at 10:00 a.m. (Eastern Time) as more fully set out in the Bid Procedures. Nothing in this order shall limit the right of any party to object, at the Sale Hearing, to a sale that does not honor any existing or future obligations under the National Labor Relations Act.

8.     The Sale Hearing shall be held before this Court, following the Auction, on September 12, 2011. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties-in-interest other than by announcement of said adjournment before this Court.

9.     Objections, if any, to the relief requested in the Sale Motion must: (a) be in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the District of Massachusetts on or before 4:30 p.m. (Eastern Time) on September 8, 2011; and (d) be served so as to be received no later than 4:30 p.m. (Eastern Time) on September 8, 2011, upon (i) counsel to the Debtor, Nutter, McClennen & Fish LLP, Seaport West, 155 Seaport Blvd., Boston, MA 02210 (attn: Richard S. Rosenstein, Esq.); E-mail rrosenstein@nutter.com (ii) counsel to the Committee, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178 (attn: Eric R. Wilson, Esq. and Jason R. Adams, Esq.) E-Mail ewilson@kelleydrye.com and jadams@kelleydrye.com, and (iii) counsel to the Stalking Horse Purchaser, Patton Boggs LLP, 8484 Westpark Drive, Suite 900, McLean, VA 22102 (Fax: (703) 744-8001, Attn: Alan Noskow; E-mail: anoskow@pattonboggs.com) and 2550 M Street NW, Washington, DC 20037 (Fax: (202) 457-6315, Attn: Erika Morabito; E-mail: emorabito@pattonboggs.com).

5

10.    All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the transfer of the Acquired Assets.

11.    All bidders at the Auction shall be deemed to have consented to the core jurisdiction of this Court and waived any right to jury trial in connection with any dispute relating to the Auction, the sale of the Acquired Assets and construction and enforcement of the Stalking Horse Agreement.

12.    Notwithstanding any extent to which Federal Rule of Bankruptcy Procedure 6004(h) may be applicable, this is a final order effective immediately.

Date: August 2 _, 2011

UNITED STATES BANKRUPTCY JUDGE

6

**<u>Exhibit I</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>WOMEN'S APPAREL GROUP, LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 11-16217 (JNF) |

## BID PROCEDURES[1]

The above-captioned debtor (the "**Debtor**") is a debtor in possession in the United States Bankruptcy Court in the District of Massachusetts (the "**Bankruptcy Court**"), under Case No. 11-16217 (JNF). By motion dated July 15, 2011 as supplemented and revised by Debtor's Motion Requesting (I) Approval of (A) Order Approving Bid Procedures For Sale Of Debtor's Assets; (B) Bid Procedures; (C) Notice Of Sale; And (D) Form Of Asset Purchase Agreement with Stalking Horse Bidder; And (II) Related Relief (collectively the "**Motion**"), the Debtor seeks, among other things, approval of the process and procedures set forth below (the "**Bid Procedures**") to effectuate the sale (the "**Sale**") of substantially all of the Debtor's assets to be acquired in accordance with the Sale (the "**Acquired Assets**")[2] outside the ordinary course of business free and clear of all liens, claims, encumbrances and other "interests" within the meaning of 11 U.S.C. § 363(f) of the Bankruptcy Code (collectively, the "**Encumbrances**").[3] The Bid Procedures are designed to facilitate a full and fair bidding process to maximize the value of the Acquired Assets for the benefit of the Debtor's creditors and its bankruptcy estate.

Set forth below are the Bid Procedures to be employed with respect to the Sale. The Acquired Assets being purchased and the terms and conditions upon which the Debtor contemplates consummating the Sale are further described in the form of Asset Purchase Agreement (the "**Purchase Agreement**") between the Debtor and Distinctive Apparel, Inc. ("**DAI**" or the "**Stalking Horse Purchaser**"). Copies of the Purchase Agreement are available by sending a written request, by mail or e-mail, to Debtor's counsel, Nutter McClennen & Fish LLP, Seaport West, 155 Seaport Boulevard, Boston, MA 02210 (Attn: Richard S. Rosenstein,

---

[1] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Purchase Agreement (defined herein).

[2] "Acquired Assets" shall refer to the Purchased Assets as more fully set forth in the Purchase Agreement.

[3] Nothing in these Bid Procedures or the Order approving these Bid Procedures shall be deemed to limit the obligation of any party, including but not limited to the Successful Bidder (as defined below), to bargain in good faith with the collective bargaining representative of the employees of WAG in accordance with the National Labor Relations Act, as amended, 29USC §151 et seq.. *the Debtor*

Esq., E-mail: RRosenstein@nutter.com). The Sale pursuant to the Purchase Agreement is subject to competitive bidding as set forth herein and approval of the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code.

On September 12, 2011, as further described below, the Bankruptcy Court shall conduct a hearing (the "**Sale Hearing**") at which time the Debtor shall seek entry of an order (the "**Sale Order**") authorizing and approving the sale of the Acquired Assets to the Successful Bidder (as defined below) on terms and conditions consistent with the Purchase Agreement and in accordance with these Bid Procedures. The Sale Hearing shall be held following the Auction (as discussed below).

While the assets to be purchased as part of the Sale do not include the Excluded Assets (as defined in the Purchase Agreement), and the Purchase Agreement does not provide for the Debtor's assumption of, and assignment to, the Stalking Horse Purchaser, of any executory contracts and unexpired leases of the Debtor, the Debtor is willing to consider offers that include Excluded Assets or that provide for the assumption and assignment of the Debtor's executory contracts and unexpired leases (the "**Assigned Contracts**").

*Participation Requirements*

Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, each person or entity (a "**Potential Bidder**") must first deliver (unless previously delivered), on or before the Bid Deadline (as defined below) to (i) counsel to the Debtor, Nutter McClennen & Fish LLP, Seaport West, 155 Seaport Boulevard, Boston, MA 02210 (Attn: Richard S. Rosenstein, Esq.); and (ii) counsel to the Creditors' Committee (the "**Committee**"), Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178(Attn: Eric R. Wilson, Esq. and Jason R. Adams, Esq.); the following items (collectively, the "**Participation Requirements**"):

    (a)    <u>Confidentiality Agreement</u>. An executed confidentiality agreement in form and substance reasonably acceptable to the Debtor and the Committee (each a "**Confidentiality Agreement**"); and

    (b)    <u>Proof of Financial Ability to Perform</u>. Evidence satisfactory to the Debtor and the Committee of such person's or entity's financial capacity.

After a Potential Bidder delivers the Confidentiality Agreement and evidence satisfactory to the Debtor and the Committee of financial ability, the Debtor shall deliver or make available to each Potential Bidder certain designated information and financial data with respect to the Acquired Assets and access to the data room.

*Access to Due Diligence Materials*

Upon satisfaction of the Participation Requirements, the Debtor will afford each Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder; provided, however, that (i) the Debtor, in consultation with the Committee,

2

shall have the right to reasonably limit the due diligence provided to competitors for the type of information described in section 107 of the Bankruptcy Code, and (ii) the Debtor will have no obligation to provide due diligence access after the Bid Deadline (defined below). The Debtor will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access for Potential Bidders.

If the Debtor furnishes any information related to the Debtor or the Acquired Assets not theretofore given to the Stalking Horse Purchaser, then the Debtor shall promptly make such information available to the Stalking Horse Purchaser.

*Bid Deadline*

A Potential Bidder that desires to make a bid shall deliver copies of its bid by facsimile and/or email to (i) counsel to the Debtor, Nutter McClennen & Fish LLP, Seaport West, 155 Seaport Boulevard, Boston, MA 02210 (Fax: (617) 310-9563; E-mail: RRosenstein@nutter.com); (ii) counsel to the Creditors' Committee, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178 (Fax: (212) 808-7897 – Attn: Eric R. Wilson, Esq. and Jason R. Adams, Esq., E-mail: ewilson@kelleydrye.com, jadams@kelleydrye.com); and (iii) to the of the United States Trustee, John. W. McCormack Post Office and Court House, 5 Post Office Square, Suite 1000 Boston, MA 02109-3945 (Fax: (617) 565-6368; E-Mail: paula.bachtell@usdoj.gov) (collectively, the "**Notice Parties**") by 4:30 p.m. (Eastern Time) on September 8, 2011 (the "**Bid Deadline**"). A Bid received after the Bid Deadline shall not constitute a Qualified Bid (as defined below).

*Bid Requirements*

All bids must be accompanied by a letter:

(a)     offering to acquire the Acquired Assets, accompanied by an agreement attached to the letter, marked to show any proposed amendments and modification to the Purchase Agreement and its schedules and exhibit (the "**Marked Agreement**"). Each Bid shall be for all or a portion of the Acquired Assets that the Potential Bidder seeks to acquire. Each Bid may also include Excluded Assets and potential assumption or assignment of the Assigned Contracts and an agreement to complete the sale subject to the procedure to assume and assign any such Assigned Contract as provided below. **EXCEPT AS EXPRESSLY PROVIDED IN THE PURCHASE AGREEMENT, DEBTOR MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE CONDITION OF THE ACQUIRED ASSETS AT CLOSING AND PURCHASER TAKES SUCH ACQUIRED ASSETS ON AN AS-IS / WHERE-IS BASIS.**

(b)     agreeing that the Potential Bidder's offer is binding and irrevocable until 48 hours after the earlier of (i) the closing of the sale of the Acquired

3

Assets, (ii) the withdrawal of the Acquired Assets for sale, or (iii) 30 days after the Sale Hearing; and

(c)   offering to pay a purchase price greater than the aggregate consideration offered by the Stalking Horse Purchaser pursuant to the Purchase Agreement by at least $100,000 plus the full amount of the Expense Reimbursement (the "**Initial Bid Increment**").

Bids must be accompanied by:

(a)   a certified check or wire transfer in an amount equal to 10% of the cash component portion of the bid payable to the order of the Debtor (the "**Good Faith Deposit**"). Each Bid must provide that the Potential Bidder will forfeit its Good Faith Deposit as liquidated damages if such Bidder defaults under or revokes the contemplated Sale prior to the consummation of the Sale with the Successful Bidder (defined below). A Bidder shall forfeit the Good Faith Deposit if (i) the Bidder is determined to be a Qualified Bidder and withdraws its bid before the Bankruptcy Court approved the Debtor's and the Committee's selection of the winning bid, and/or (ii) withdraws or breaches the Purchase Agreement without Debtor's and the Committee's consent before consummation of the sale.

(b)   Each Potential Bidder shall deliver written evidence to the Debtor and the Committee, sufficient for the Debtor and the Committee to reasonably conclude that the Potential Bidder has the necessary financial ability to close the contemplated Sale and provide adequate assurance of future performance under any Assigned Contracts to be assumed and assigned in such contemplated Sale as part of the Acquired Assets. Such information should include, inter alia, the following:

(i)   the Potential Bidder's current financial statements (audited if they exist); provided, however, that in lieu of a Potential Bidder's financial statements, the Debtor and the Committee may accept other information that reasonably demonstrates a Potential Bidder's financial condition; and

(ii)   any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor and the Committee demonstrating that such Potential Bidder has the ability to close the contemplated Sale; provided, however, that the Debtor and the Committee shall determine, in their reasonable discretion, in consultation with their respective advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications.

4

(c)     Authorization to Bid. A Bid shall include evidence of authorization and approval from such Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

(d)     No Fees payable to Qualified Bidder. A Bid (other than the Stalking Horse Purchaser's Bid(s)) may not request or entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid a Potential Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bidding Procedures.

(e)     Financing Sources. A Bid must contain evidence of the ability to consummate the Transaction satisfactory to the Debtor and the Committee with appropriate contact information for all such financing sources.

*Designation as Qualified Bidder*

The Debtor and the Committee will review each bid received from a Potential Bidder to ensure it meets the requirements set forth above. Additionally, the Debtor will also promptly deliver to counsel for The New England Joint Board, UNITE-HERE, the name and contact information for the entity, including name of contact person, address, telephone number and email address of any Potential Bidder that submits a bid with a summary of any provision of such bid that varies from the agreement of the Stalking Horse Bidder related to the employees of the Debtor. A bid received from a Potential Bidder that meets the above requirements will be considered a **"Qualified Bid"** and each Potential Bidder that submits a Qualified Bid will be considered a **"Qualified Bidder"** The Debtor and the Committee will determine whether each bid meets the requirements of a Qualified Bid.

A Qualified Bid will be valued by the Debtor and the Committee based upon any and all factors that the Debtor and the Committee deem pertinent, including, among others (a) the amount of the Qualified Bid, (b) the risks and timing associated with consummation a transaction with the Potential Bidder, (c) any Excluded Assets or executory contracts and leases, and (d) any other factors that the Debtor and the Committee may deem relevant to the Sale. As soon as is practicable, after receipt of such documents the Debtor shall notify the Potential Bidder that such Potential Bidder is a Qualified Bidder. In the event that a Bid is determined not to be a Qualified Bid in accordance with the conditions set forth above, the Qualified Bidder shall be promptly notified by the Debtor of any conditions which it has failed to satisfy and the Potential Bidder shall have until the time of the Auction to modify its Bid to render it a Qualified Bid. If a Qualified Bidder declines or fails to modify its Bid to the satisfaction of the Debtor and the Committee as provided for herein, the Qualified Bidder shall be refunded its Good Faith Deposit and any accumulated interest thereon upon or within one (1) business day after entry of the Sale Order.

5

The Debtor and the Committee, in their reasonable judgment, reserve the right to reject any bid if such bid: (a) is on terms that are more burdensome or conditional that the terms of the Purchase Agreement; (b) requires any indemnification of such Potential Bidder; (c) is not received by the Bid Deadline; (d) is subject to any due diligence; or (e) is conditioned on obtaining internal approval, obtaining financing or the successful assumption and assignment of any Assigned Contract.

If the Debtor and the Committee cannot agree as to whether a bid qualifies as a Qualified Bid or if a Potential Bidder believes that it should have been found to be a Qualified Bidder, notwithstanding the determination of the Debtor and the Committee, such Potential Bidder, the Debtor or the Committee may file an emergency motion with the Bankruptcy Court to resolve the dispute and the Bankruptcy Court shall grant emergency determination of such motion under MBLR 9013-1(h), which determination shall be made immediately prior to the Auction, on September 12, 2011 at 10:00 a.m. (Eastern Time).

DAI is and shall at all times be deemed to be a Qualified Bidder and shall, subject to confirmation by the Debtor, DAI and the Committee of the outstanding senior debt under the pre-petition loan documents and the DIP financing and any further determination of the secured status of the DAI claim as required by the Bankruptcy Court, be entitled to credit bid all or a portion of its claims against the Debtor (excluding the Expense Reimbursement) to the fullest extent permissible under section 363(k) of the Bankruptcy Code.    Notwithstanding any provisions to the contrary herein, DAI shall not be required to (i) submit a Bid or Qualified Bid for purposes of exercising its right to credit bid under section 363(k) of the Bankruptcy Code, or (ii) post a Good-Faith Deposit.

*Participation in the Auction*

Any person or entity may attend the Auction.  Each Qualified Bidder in attendance shall confirm that it has not engaged in any collusion with respect to the bidding or the sale. Only the Stalking Horse Purchaser and other Qualified Bidders may make any subsequent Bids at the Auction.

The Bankruptcy Court, the Debtor and its professional advisors shall direct and preside over the Auction. All non-material procedures at the Auction may be modified by the Debtor and the Committee, with the approval of the Bankruptcy Court. Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid for the Acquired Assets or any portion(s) thereof, as determined by the Debtor and the Committee (the "**Baseline Bid**").  All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders and the Stalking Horse Purchaser. The Debtor shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids and the Successful Bid(s).

*Auction*

In the event that the Debtor receives at least one (1) Qualified Bid (other than the Bid by the Stalking Horse Purchaser) by the Bid Deadline, the Debtor shall conduct the Auction of the

Acquired Assets (including any Assigned Contract subject to the procedure for assumption and assignment provided below) to determine the highest and otherwise best bid with respect to the Acquired Assets. No later than September 9, 2011 at 4:30 p.m. (prevailing Eastern time), the Debtor will notify all Qualified Bidders of the Baseline Bid. The Auction shall commence on or about September 12, 2011 at 10:00 a.m. in Court Room 1, 12th Floor, 5 Post Office Square, Boston, MA 02109.

If, however, no such Qualified Bid other than that of the Stalking Horse Purchaser is received by the Bid Deadline, then no Auction shall be conducted and the Debtor will report the same to the Bankruptcy Court, will declare the Stalking Horse Purchaser the Successful Bidder and will proceed with the Transaction pursuant to the terms of the Purchase Agreement, upon entry of an order approving the sale of the Acquired Assets to the Stalking Horse Purchaser.

*Terms of Overbids*

An "**Overbid**" is any bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid. Any Overbid on the Acquired Assets must be made in increments of at least $50,000 over the previous highest or best bid.

Each Overbid must comply with the conditions for a Qualified Bid set forth above other than the Initial Bid Increment. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtor and the Committee accept a higher Qualified Bid as an Overbid. The Debtor and the Committee shall announce at the Auction the material terms of each Overbid and the basis for calculating the total consideration offered in each such Overbid.

*Closing the Auction*

Upon conclusion of the bidding, the Debtor and the Committee shall determine, the highest or otherwise best offer or combination of offers for the Acquired Assets (the "**Successful Bid**") and the entity or entities submitting such Successful Bid(s) (the "**Successful Bidder**"), and the next highest or otherwise best offer or offers after the Successful Bid (the "**Back-Up Bid**") and the entity or entities submitting such Back-Up Bid (the "**Back-Up Bidder**"), and advise the Qualified Bidders of such determinations.

Thereafter, the Auction shall be closed, and the Debtor and the Committee shall immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale. If the Stalking Horse Purchaser's final bid is deemed to the highest and best bid at the Auction, the Stalking Horse Purchaser shall be the Successful Bidder. The Back-Up Bid shall remain open, and the Back-Up Bidder shall be required to fully perform under such Back-Up Bid, until consummation of the sale with the Successful Bidder.

*Failure to Close*

7

Following the approval of the sale of the Acquired Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale as a result of the Successful Bidder's default or breach under the applicable purchase agreement in accordance with the terms of such purchase agreement by the closing date contemplated in such purchase agreement or in any event within thirty (30) days after entry of an Order approving the Sale, the Debtor and the Committee shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtor shall be authorized, but not required, to consummate the sale with the Back-Up Bidder submitting such Back-Up Bid without further order of the Bankruptcy Court and shall retain the Successful Bidder's Good Faith Deposit as liquidated damages for its failure to close.

*Stalking Horse Purchaser Expense Reimbursement*

If Debtor accepts a Successful Bid, other than a bid of the Stalking Horse Purchaser, as the highest or best offer, Debtor shall pay Stalking Horse Purchaser promptly following the Sale of the Acquired Assets to the Successful Bidder (the "**Competing Transaction**") as reasonable compensation for the Stalking Horse Purchaser's efforts in connection with the negotiation and execution of the Purchase Agreement and the transactions contemplated thereby the amount of all actual and provable costs and expenses of the Stalking Horse Bidder directly incurred by the Stalking Horse Purchaser in relation to its negotiation and execution of the Purchase Agreement and the transactions contemplated thereby, as determined by the Bankruptcy Court, up to a maximum amount of $420,000 (the "**Expense Reimbursement**"). No Expense Reimbursement will be due and owing unless the Bid Procedures have been approved and the Stalking Horse Purchaser is not the winning bidder in the Auction. If the Stalking Horse Purchaser is not the winning bidder, within three (3) business days after the Auction, the Stalking Horse Purchase shall serve on counsel for the Debtor, counsel for the Committee and the U.S. Trustee copies of all invoices comprising the Expense Reimbursement. The Debtor may pay the Expense Reimbursement unless the Debtor, the U.S. Trustee or the Committee objects, in writing within seven (7) days of receipt of the invoices, to the reasonableness of the fees, costs and expenses included in any invoices submitted hereunder. If any objection remains unresolved after seven (7) days, the objection may be submitted to the Bankruptcy Court.

The Expense Reimbursement obligation of Debtor shall be payable solely from the proceeds from a Competing Transaction or other sale of the Acquired Assets or any portion thereof, as applicable. In this regard, the Debtor and the Committee shall only be permitted to accept a Bid that provides for the payment of cash proceeds at closing of an amount sufficient to pay the Expense Reimbursement. In the event the amount of the Expense Reimbursement has not been finally determined by the closing of the sale to the winning bidder, the Debtor shall be required to segregate a portion of the cash proceeds received at closing in an amount equal to the amount of the Expense Reimbursement being sought by the Stalking Horse Purchaser (not to exceed $420,000) until such time as the amount of the Expense Reimbursement has been finally determined and paid to the Stalking Horse Purchaser. Notwithstanding anything to the contrary herein or in any other document, the Stalking Horse Purchaser reserves the right to seek payment of the Expense Reimbursement as an administrative expense of Debtor and Debtor's estate under sections 503(b) and 507(a) of the Bankruptcy Code.

8

*Consent to Jurisdiction as Condition to Bidding*

All Qualified Bidders, including the Stalking Horse Purchaser, at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Qualified Bidder's contemplated Transaction documents, as applicable.

*Acceptance of Successful Bid*

The Debtor shall sell the Acquired Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtor's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of such bid. The Debtor will be deemed to have accepted a Qualified Bid only when such bid has been approved by the Bankruptcy Court at the Sale Hearing.

*Free of Any and All Interests*

As set forth in the Purchase Agreement, except as otherwise provided for therein or in another Successful Bidder's purchase agreement, all of the Debtor's right, title and interest in and to the Acquired Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests therein and there against (collectively, the "**Interests**"), in accordance with 11 U.S.C. §363, with such Interests to attach to the net proceeds of the sale of the Acquired Assets in the same order and manner as such Interests attached to the Acquired Assets.

*Sale Hearing*

The Sale Hearing shall be conducted by the Bankruptcy Court on September 12, 2011, following the conclusion of the Auction.

*Return of Good Faith Deposit*

The Good Faith Deposit of the Successful Bidder shall be applied to the Purchase Price of such transaction at Closing. The Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until consummation of the Proposed Sale with the Successful Bidder, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder as provided above, the Debtor shall be entitled to retain the Good Faith Deposit as liquidated damages for such breach or failure to perform by the Successful Bidder.

*Assumption and Assignment of Assumed Contracts*

If the Successful Bid includes any Assigned Contracts, the Debtor shall serve on each counter-party to any such Assigned Contract a notice of assumption and assignment by serving such notice as provided in the Assigned Contract or if counsel to the holder of the Assigned Contract has entered an appearance to counsel for such holder of the Assigned Contract by first

9

class and electronic mail.  The notice shall provide that each holder of any Assigned Contract may serve an objection to such assumption and assignment under section 365 of the Bankruptcy Code within fourteen (14) days of service of such notice.  The notice shall set forth (a) a statement that any assumption and assignment shall be allowed only to the extent permitted under section 365 of the Bankruptcy Code, (b) a description of the Assigned Contract by title and date and any amendment thereto, (c) the total amount that the Debtor shows on its books and records as due and payable to cure any payment default under the Assigned Contract through the date of its proposed assumption (the "**Cure Amount**"), (d) the name and address of the Successful Bidder, (e) evidence from the Successful Bidder that the Successful Bidder can provide adequate assurance of future performance, which evidence may be supplemented after delivery of the notice,  (f) the name and address of the party from which the holder of the Assigned Contract may obtain financial information about the Successful Bidder, and (g) the time by which any objection to such assumption and assignment under section 365 of the Bankruptcy Code must be filed with the Bankruptcy Court. The Bankruptcy Court shall rule on any assumption and assignment of any Assigned Contract at the Sale Hearing or on such other date as the Bankruptcy Court may designate.  Failure by the Bankruptcy Court to approve any assumption and assignment of any Assumed Contract shall not allow the Successful Bidder to withdraw the Successful Bid.   An order approving the assumption and assignment of any Assigned Contract need not be obtained at or prior to the Sale Hearing.  The Successful Bidder shall bear all costs of the Debtor's estate, the Debtor and the Committee incurred in connection with any proposed assignment of an Assigned Contract that is not approved by the Bankruptcy Court by the Sale Hearing, including, but not limited to, providing the above notice(s), resolving any objections to the assumption and assignment of an Assigned Contract and any hearings or pleading in connection therewith.

*Modifications*

*which modification shall be* *

     The Debtor, with the consent of the Creditors Committee, expressly reserves the right to seek to modify the relief requested herein/ Moreover, the Debtor, with the consent of Creditors Committee, reserves the right to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders, (b) impose additional terms and conditions with respect to any or all potential bidders, (c) extend the deadlines set forth herein, and (d) amend the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

\* *subject to the approval of the Court.*

**<u>Exhibit II</u>**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

| | |
|---|---|
| In re: | ) |
| | ) |
| WOMEN'S APPAREL GROUP, LLC | )   Chapter 11 |
| | )   Case No. 11-16217 (JNF) |
| Debtor. | ) |
| | ) |

**NOTICE OF (I) INTENDED SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S
ASSETS FREE AND CLEAR OF ANY LIENS, CLAIMS, ENCUMBRANCES AND
INTERESTS, (II) DEADLINES AND PROCEDURES FOR SUBMITTING
OBJECTIONS, COUNTEROFFERS, OR BIDS, AND (III) HEARING DATE**

**PLEASE TAKE NOTICE** that on July 15, 2011, Women's Apparel Group, LLC, the above
captioned debtor and debtor-in-possession (the "Debtor") filed its Motion Requesting
(I) Approval of (A) Asset Purchase Agreement And Authorizing The Sale of Substantially All of
The Debtor's Assets Outside The Ordinary Court of Business, Free And Clear of All Liens,
Claims, Interests And Encumbrances, And Subject to Competing Offers; and (B) Bid And
Auction Procedures; And (II) Related Relied as supplement and revised by that certain Motion
Requesting (I) Approval of (A) Order Approving Bid Procedures for Sale of Debtor's Assets; (B)
Bid Procedures; (C) Notice of Sale; And (D) Form of Asset Purchase Agreement with Stalking
Horse Bidder; And (II) Related Relief dated August 21, 2011 (collectively the "Motion").
Pursuant to the Motion, under 11 U.S.C. § 363, Fed. R. Bankr. P. 2002(a)(2) and 6004, and
MLBR 2002-5 and 6004-1, the Debtor seeks to sell substantially all of its assets free and clear of
any and all liens, claims, encumbrances. and interests, of any kind or nature whatsoever[1], by a
sale to Distinctive Apparel, Inc. ("DAI") under the terms of an Asset Purchase Agreement dated
August 22, 2011 ("APA") or to a higher or better bidder pursuant to the procedures outlined
below.

**PLEASE TAKE FURTHER NOTICE** that on August 22,2011, pursuant to the Motion, the
United States Bankruptcy Court for the District of Massachusetts (the "Court") entered an order
(the "Procedures Order") approving the Debtor's proposed bidding procedures and expense
reimbursement of DAI (the "Bid Procedures") in connection with the proposed sale at an auction
(the "Auction") to be conducted at **Courtroom 1, 12th Floor, 5 Post Office Square, Boston,
MA 02109 on September 12, 2011 at 10:00 a.m.** All interested parties may attend the Auction.

---

[1] Notwithstanding the forgoing, nothing in this Order, shall be deemed to limit the obligation of any party, including
but not limited to the Successful Bidder (as defined below), to bargain in good faith with the collective bargaining
representative of the employees of WAG in accordance with the National Labor Relations Act, as amended, 29USC
§151 et seq..

A copy of the Motion, the Procedures Order and the Bid Procedures can be obtained by requesting same from the Debtor's counsel at the address set forth below.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Procedures, the Debtor is soliciting alternative buyers (each, a "Potential Bidder") for the assets that are subject of the APA. A Potential Bidder shall deliver to the Debtor's counsel and counsel for the Committee a signed confidentiality agreement and evidence of such Potential Bidder's financial capacity.

**PLEASE TAKE FURTHER NOTICE** that to be a Qualified Bidder entitled to participate at the Auction, each Potential Bidder shall submit a bid in accordance with the Bid Procedures by facsimile and/or email to ((i) counsel to the Debtor, Nutter McClennen & Fish LLP, Seaport West, 155 Seaport Boulevard, Boston, MA 02210 (Fax: (617) 310-9563; E-mail: RRosenstein@nutter.com); (ii) counsel to the Creditors' Committee, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178 (Fax: (212) 808-7897 – Attn: Eric R. Wilson, Esq. and Jason R. Adams, Esq., E-mail: ewilson@kelleydrye.com, jadams@kelleydrye.com); and (iii) to the of the United States Trustee, John. W. McCormack Post Office and Court House, 5 Post Office Square, Suite 1000 Boston, MA 02109-3945 (Fax: (617) 565-6368; E-Mail: paula.bachtell@usdoj.gov) (collectively the "Notice Parties") by 4:30 p.m. (Eastern Time) on September 8, 2011 (the "Bid Deadline"). No bid shall be considered by the Debtor and the Committee unless it complies with the requirements set forth in the Bid Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtor is not seeking to assume or assign any executory contracts or unexpired leases at this time but reserves the right to seek to assume or assign executory contracts or unexpired leases in the future, on notice to the counterparties to such agreements.

**PLEASE TAKE FURTHER NOTICE** that the Debtor shall request that the assets to be sold as provided in the APA will be sold free and clear of all liens, claims, encumbrances, and interests, to the fullest extent permitted under 11 U.S.C. §363, with perfected, enforceable, valid liens to attach to the proceeds of the sale to the same extent, with the same validity, and in the same order of priority as existed under applicable law[2].

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider the Sale Motion and approval of the sale of assets in accordance with the APA to the DAI, or to any other successful bidder, is scheduled to take place before the Honorable Joan N. Feeney, on September 12, 2011 after completion of the Auction as the United State Bankruptcy Court sitting in Boston at the John W. McCormack Post Office and Curt House, 5 Post Office Square, Boston, Ma 02109 in Court Room 1 (the "Sale Hearing").

**PLEASE TAKE FURTHER NOTICE** that any objections to the Sale Motion and/or the sales of assets contemplated thereby must (a) be in writing; (b) state the legal and factual basis for such objection; and (c) be filed with the Clerk of Court, United States Bankruptcy Court, John W. McCormack Post Office and Court House, 5 Post Office Square, Suite 1150 Boston, MA 02109-3945 and be served on the Notice Parties so as to be actually received by September 8, 2011 at 4:30pm (the "Objection Deadline").

---

[2] SEE FOOTNOTE 1

**PLEASE TAKE FURTHER NOTICE** that, if no Qualified Bids are submitted by the Bid Deadline and no objections to the Sale Motion are filed by the Objection Deadline, the Court, in its discretion, may cancel the scheduled Auction and Sale Hearing and approve the sale contemplated thereby without further notice or hearing.

Dated: Boston. Massachusetts
August 22, 2011

Respectfully submitted,

WOMEN'S APPAREL GROUP, LLC
By its counsel,
/s/ Richard S. Rosenstein
Richard S. Rosenstein (BBO #429100)
NUTTER, MCCLENNEN & FISH, LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2563

rrosenstein@nutter.com

3

**<u>Exhibit III</u>**

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of August 22—, 2011, is by and between Distinctive Apparel, Inc., as the holder of the indebtedness evidenced by the Loan Agreement and the Note, as each such term is hereinafter defined, ("Buyer") and Women's Apparel Group, LLC ("Seller"). Buyer and Seller are each individually referred to as a "Party" and collectively referred to as the "Parties". Defined terms used and not defined elsewhere in this Agreement have the meanings ascribed to them in Article 1.

## RECITALS

A. On June 29, 2011 (the "Petition Date"), certain unsecured creditors of Seller filed an involuntary petition initiating a case (the "Case") under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court, District of Massachusetts, Eastern Division (the "Bankruptcy Court").

B. On July 12, 2011, Seller filed its Motion by Debtor for Entry of an Order For Relief and to Convert Case to Chapter 11 Pursuant to 11 U.S.C. §706(a) in the Bankruptcy Court. On July 13, 2011 (the "Order for Relief Date"), the Bankruptcy Court entered an order for relief which converted the case to a voluntary chapter 11. Since the Order for Relief Date, the Seller has continued in possession of its properties and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C. On July 15, 2011, the Debtor filed the *Debtor's Motion Requesting (I) Approval of (A) Asset Purchase Agreement And Authorizing The Sale of Substantially All of The Debtor's Assets Outside The Ordinary Court of Business, Free And Clear of All Liens, Claims, Interests And Encumbrances, And Subject to Competing Offers; and (B) Bid And Auction Procedures; And (II) Related Relied* (the "Sale Motion").

D. On July 20, 2011, the Office of the United States trustee for the District of Massachusetts (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors of Women's Apparel Group, LLC (the "Committee").

E. Buyer desires to purchase, and Seller desires to sell, certain assets owned by Seller pursuant to Section 363 of the Bankruptcy Code in accordance with, and subject to, the terms and conditions of this Agreement.

## AGREEMENT

In consideration of the premises and of the mutual representations, warranties, promises, and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, and intending to be legally bound hereby, it is hereby agreed by Seller and Buyer as follows:

## ARTICLE 1
## CERTAIN DEFINITIONS

**Section 1.1** **Definitions.** The Parties agree that the following terms shall have the meanings hereinafter set forth, such definitions to be applicable equally to the singular and plural forms, and to the masculine and feminine forms, of such terms:

**1.1.1** "Action" shall have the meaning ascribed in Section 10.13.

**1.1.2** "Accounts" shall mean all present and future rights of Seller to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, or (d) arising out of the use of a credit or charge card or information contained on or for use with the card.

**1.1.3** "Affiliate" shall mean, with respect to any given Person, any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such given Person. For the purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have the meanings correlative to the foregoing.

**1.1.4** "Agreement" shall mean this Agreement, as the same may be amended, modified, or supplemented from time to time in writing by Buyer and Seller.

**1.1.5** "Assumed Liabilities" shall mean:

(i)    any administrative expenses incurred or becoming due at any time from the Petition Date through the Closing, to the extent such administrative expenses are allowed by the Bankruptcy Court in the Case, including any administrative expense claims under Section 503(b)(9) of the Bankruptcy Code and any amounts due to Redcats USA, Inc. for use of the Redcats Equipment (as defined below) by the Debtor (commensurate with amounts previously paid for such Redcats Equipment); provided, however, that an administrative expense shall be deemed allowed unless an objection is filed in the Bankruptcy Court by the Buyer at the Buyer's sole expense; and provided, further that Assumed Liabilities shall not include administrative expenses relating to professional fees in amounts in excess of the amounts set forth in any Approved Budget as defined in the DIP Order;

(ii)    all liabilities under any Contract that is assumed and assigned to Buyer;

(iii)    all liabilities under any Lease that is assumed and assigned to Buyer;

(iv)    any cure costs associated with any Contract or Lease that is assumed and assigned to Buyer;

(v)     all liabilities of the Seller arising from ownership or use of the Purchased Assets from and after the entry of the Sale Order approving the sale of the Purchased Assets to the Buyer;

(vi)     all liabilities arising from and after the Closing with respect to the employment, either directly or through a third party, of the Transferred Employees;

(vii)     obligations to customers for customer deposits; and

(viii)     any and all liabilities, other than unsecured rejection damages, under any executory contract or lease of the Seller that is incurred or chargeable against the Seller or the Seller's bankruptcy estate as a result of the assumption of any Contact or Lease as provided in Section 8.6 of this Agreement.

**1.1.6**   "Bankruptcy Code" shall have the meaning ascribed in the Recitals.

**1.1.7**   "Bankruptcy Court" shall have the meaning ascribed in the Recitals.

**1.1.8**   "Bid Procedures" shall mean those certain bid procedures in substantially the form attached as Exhibit A-2 hereto, to be filed by Seller with the Bankruptcy Court.

**1.1.9**   "Bid Procedures Order" shall mean an order of the Bankruptcy Court, approving the Bid Procedures substantially in the form attached hereto.

**1.1.10**   "Bill of Sale" shall mean a bill of sale in form and substance acceptable to Buyer.

**1.1.11**   "Books and Records" shall mean all data, books, records, manuals, documents, correspondence, sales and credit reports, literature, brochures, advertising material and the like incidental to or used in Seller's business or relating to the Purchased Assets, including, without limitation, (i) service and warranty records; (ii) sales and credit records, catalogs and brochures relating to Seller's business, sales support and promotion materials, creative materials, art work, photographs, public relations and advertising material, studies, reports, shipping materials, office supplies and materials, sales and marketing files correspondence and other similar documents and records used in Seller's business, whether in electronic form or otherwise; (iii) all client, customer and supplier lists, files, order information, telephone numbers, addresses and electronic mail addresses and the other information with respect to past, present or prospective clients, customers and suppliers incidental to or used in Seller's business; (iv) accounting records; (v) cost and pricing information; (vi) sales and credit records, purchasing records, records relating to suppliers and other records relating to Seller's business; and (vii) all policies of insurance.

**1.1.12**   "Buyer Note" shall have the meaning ascribed in Section 2.2(b).

**1.1.13**   "Casual Living" shall mean Casual Living Acquisition, LLC, a Massachusetts limited liability company.

**1.1.14** "Claim" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

**1.1.15** "Closing" shall have the meaning ascribed in Section 8.1.

**1.1.16** "Closing Date" shall have the meaning ascribed in Section 8.1.

**1.1.17** "Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

**1.1.18** "Contract" shall mean any written or oral contract, agreement, note, bond, mortgage, indenture, deed of trust, lease, sublease, license, sublicense, purchase or sale order, quotation or other commitment, obligation or instrument of any kind that is legally binding or enforceable under applicable law.

**1.1.19** "Credit Card Agreements" shall mean all agreements entered into by Seller with any credit card issuer or credit card processor, including, without limitation, the agreements set forth in Schedule 1.19 hereto.

**1.1.20** "Credit Card Receivables" shall mean, collectively, all present and future rights of Seller to payment from any credit card issuer, credit card processor or other third party receivables arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and all present and future rights of Seller to payment from any credit card issuer, credit card processor or other third party in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, all amounts at any time due or to become due from any credit card issuer or credit card processor under the Credit Card Agreements, including, without limitation, the items set forth on Schedule 1.20 hereto.

**1.1.21** "Customer Lists" means all customer lists including all information related to such customers as maintained in the ordinary course of the Seller's business and maintained in accordance with the existing Privacy Policy of the Seller, including any limitations upon the use of any such information from customers as agreed to by the Seller and its customers in accordance with the terms of use of any policy published on any web site maintained by the Seller or any catalog distributed by the Seller to its customers.

**1.1.22** "DIP Order" shall mean the Final Order, dated August 22——, 2011, granting Seller's Emergency Motion for an Order (i) Authorizing the Debtor to obtain Post-Petition Financing pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(C) And 364(D), (ii) Continuing Lender's First Lien on the Assets of the Debtor, and (iii) Granting Lender Superpriority Administrative Expense Status.

**1.1.23** "Due Diligence" shall have the meaning ascribed in Section 3.1.

**1.1.24** "Environmental Laws" shall mean all federal, state, and local environmental laws, rules, statutes, directives, binding written interpretations, binding written policies, ordinances, and regulations issued by any Governmental Entity with respect to or which

otherwise pertain to or affect the Real Property or any portion thereof, the use, ownership, occupancy, or operation of the Real Property or any portion thereof, or any owner of the Real Property, and as same have been amended, modified, or supplemented from time to time, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.), the Hazardous Substances Transportation Act (49 U.S.C. § 1802 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300f et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Solid Waste Disposal Act (42 U.S.C. § 6901 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.), the Radon and Indoor Air Quality Research Act (42 U.S.C. § 7401 note, et seq.), the Superfund Amendment Reauthorization Act of 1986 (42 U.S.C. § 9601 et seq.), comparable state and local laws, and any and all rules and regulations which have become effective prior to the date of this Agreement under any and all of the aforementioned laws.

    **1.1.25** "Equipment" shall mean all equipment owned by the Seller, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located including, without limitation, the items set forth on Schedule 1.25 hereto; provided, however, that Equipment does not include (a) any fixtures as defined under Massachusetts law with respect to leased property or (b) the equipment held by the Debtor that was the subject of that certain Amended and Restated Transition Services Agreement dated as of August 28, 2010 between the Debtor and Redcats USA, Inc. (the "Redcats Equipment"), all of which is not owned by or being sold by the Seller to the Buyer hereunder.

    **1.1.26** "Excluded Assets" shall mean:

    (i)    any asset owned by the Seller that is not a Purchased Asset;

    (ii)    any net operating losses and any rights or claims to that certain tax refund due to the Debtor in the approximate amount of $3.5 million to which Women's Apparel Group Holdings, Inc. has released any right, title, claim or interest in favor of the Seller (the "Tax Refund") (but excluding any other tax assets of the Seller including any refund of any income or franchise tax (whether any such refund is received prior to, on or after the Closing) other than the Tax Refund);

    (iii)    any actions for preferences, fraudulent conveyances and other avoidance power claims and any recoveries or proceeds thereof under chapter 5 of the Bankruptcy Code;

    (iv)    all claims, causes of action and rights of recovery belonging to the Seller, including without limitation, commercial contract and tort claims and insurance claims under directors' and officers' insurance policies;

    (v)    the Purchase Price;

    (vi)    any Contract or Lease that is not assigned to Buyer;

(vii)    except as set forth on Schedule 1.26, all insurance policies and rights to proceeds thereof;

(viii)    the equity interests of WAG Marketing owned by Seller;

(ix)    any receivable of the Seller payable by an Affiliate of the Seller, other than Casual Living;

(x)    all bank accounts of the Seller, other than the lock box account currently in place in which receipts are deposited and swept to Seller's secured lender which such account shall be transferred to Buyer; and

(xi)    any rights, claims or causes of action of Seller under this Agreement.

**1.1.27** "Expense Reimbursement" shall have the meaning set forth in Section 9.2.2.

**1.1.28** "Final Order" shall refer to an order or judgment of any Governmental Entity as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under F.R.C.P. 60(b) or any analogous rule) or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

**1.1.29** "Governmental Entity" shall mean: (i) any federal, state, county, local, municipal or foreign governmental or administrative agency or political subdivision thereof; (ii) any governmental authority, board, bureau, commission, department or instrumentality; and (iii) any court or administrative tribunal.

**1.1.30** "Hazardous Materials" shall mean any pollutants, contaminants, hazardous or toxic substances, materials or wastes (including petroleum, petroleum by-products, radon, asbestos and asbestos containing materials, polychlorinated biphenyls ("PCBs"), PCB-containing equipment, radioactive elements, infectious agents, and urea formaldehyde), as such terms are used in any Environmental Laws.

**1.1.31** "Intellectual Property Rights" means any and all of Seller's (i) trade names, trademarks, service marks, mask works and all registrations and applications for any of the foregoing; (ii) works of authorship, all copyrights related thereto and all registrations and applications therefor; (iii) inventions, discoveries, designs, industrial models, and all United States and foreign patent rights covered by, disclosed in, or otherwise related thereto, all registrations and applications therefor, and all reissues, divisions, continuations-in-part, re-examinations and extensions thereof, (iv) right to sue for past infringement and improper, unlawful or unfair use of any of the foregoing, (v) rights under intellectual property license agreements, (vi) goodwill associated with the foregoing, and (vii) undocumented intellectual property, including know-how, trade secrets, processes, technology, discoveries, unpatented inventions and designs, software, formulae, procedures and other intellectual property, documentation relating to any of the foregoing, shop rights and the right to sue for past infringement or improper, unlawful or unfair use or disclosure thereof and the right to apply for patent, design or similar protection therefor anywhere in the world, including, but not limited to, the items set forth on Schedule 1.31 hereto.

**1.1.32** "Inventory" shall mean all of Seller's inventories (including finished goods, work-in-progress, raw materials, supplies, parts or other inventory of any nature whatsoever) including, without limitation, the items set forth on Schedule 1.32 hereto.

**1.1.33** "Lease" shall mean any unexpired lease, sublease, license or other occupancy agreement.

**1.1.34** "Liabilities" shall mean all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including all liabilities for Taxes with respect to periods prior to the Closing Date (including periods prior to the Petition Date).

**1.1.35** "Licenses" shall mean, collectively, to the extent assignable, all licenses, permits, approvals, certificates of occupancy, dedications, subdivision maps and entitlements now or hereafter issued, approved or granted by any Governmental Entity (each, a "Permit"), in each case, with respect to the Purchased Assets; provided, however, that, to the extent that Seller has any right, title, or interest in any Permit that is not issued in the name of Seller then, to the extent assignable, the definition of Licenses will also include such Permits.

**1.1.36** "Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax, order of any Governmental Entity, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Buyer is a successor, transferee or continuation of any Seller and (iv) any leasehold interest, license or other right, in favor of a third party or any Seller, to use the Real Property or the Purchased Assets or any portion thereof, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

**1.1.37** "Loan Agreement" shall mean that certain Loan and Security Agreement dated as of October 17, 2008 by and among Seller, Casual Living, WAG Marketing and Buyer, as successor in interest to Wells Fargo Bank, National Association (successor by merger to Wachovia Bank, National Association) as agent and a lender thereunder, as the same has been amended or otherwise modified from time to time.

**1.1.38** "Note" shall mean that certain Amended and Restated Senior Secured Subordinated Promissory Note in the principal amount of $1,500,000 dated as of June 7, 2011, by Seller and Casual Living to the order of Buyer, as successor in interest to Women's Apparel Group FinCo, LLC, a Delaware limited liability company.

**1.1.39** "Permitted Encumbrances" shall mean (i) easements, leases, reservations, or other rights of others in, or minor defects and irregularities in title that do not materially impair the use of the encumbered property or assets for the purposes for which they are held; (ii)

mechanics', materialmen's, carriers', workers', repairers' and similar statutory liens arising in the ordinary course which liens have not had and are not reasonably likely to have a material impact on the Purchased Assets; (iii) any lien, claim, encumbrance or privilege vested in any lessor, licensor or permittor for rent or other obligations solely related to the period after Closing in respect of any assigned Contract or Lease; (iv) licenses of or other grants of rights of the Seller to use intellectual property entered into prior to the Petition Date in the ordinary course of business consistent with past practices of the Seller (and from and after the Petition Date, in the ordinary course) that do not materially impair the use of the encumbered property or assets for the purposes for which they are held; (v) liens, claims, encumbrances, title exceptions or other imperfections of title caused by or resulting from acts of Buyer or any Buyer Affiliate, employee, officer, director, agent, contractor, invitee or licensee of the Buyer; and (vi) liens for Taxes not yet due and payable.

1.1.40 "Permitted Outside Parties" shall have the meaning ascribed in Section 3.3.

1.1.41 "Person" means any individual, any corporation, limited liability company, partnership, or other entity, and any Governmental Entity.

1.1.42 "Personal Property" shall mean all of Seller's assets other than the Real Property, including, without limitation, all Accounts, Books and Records, Credit Card Receivables, Licenses, Intellectual Property Rights, Inventory, Pre-Paid Items and Receivables.

1.1.43 "Pre-Paid Items" shall mean any costs, expenses or fees paid on any item by Seller prior to the Closing Date that with respect to any period following the Closing Date is required to be reflected on the books and records of Seller in accordance with generally accepted accounting principles and listed on Schedule 1.42 hereto.

1.1.44 "Pre-Petition Indebtedness" shall mean the outstanding principal, interest and fees owed by Seller to Buyer pursuant to the Pre-Petition Loan Documents, which totaled $_____ as of August ___, 2011 (and continues to increase each day thereafter until repaid or entry of the Sale Order approving the sale to the Buyer).

1.1.45 "Pre-Petition Loan Documents" shall mean, collectively, the Loan Agreement, the Note, and each of the documents executed in connection therewith, as the same have been amended or otherwise modified from time to time.

1.1.46 "Privacy Policy" means the privacy policy accepted by customers who place orders either through catalog sales or internet sales with the Seller as such policy has been revised from time to time and accepted by customers who use the web sites maintained by the Seller or purchase merchandise through the various catalogs produced by the Seller.

1.1.47 "Purchase Price" shall have the meaning ascribed in Section 2.2.

1.1.48 "Purchased Assets" shall mean: (i) all Personal Property other than the Excluded Assets; (ii) all Contracts as may be designated by the Buyer under Section 8.6 hereof (collectively, the "Assigned Contracts"); (iii) all Leases as may be designated by the Buyer under Section 8.6) (collectively, the "Assigned Leases"); and (iv) the Real Property.

**1.1.49** "Qualified Bid" shall have the meaning ascribed to it in the Bid Procedures attached to the Bid Procedures Order.

**1.1.50** "Real Property" shall mean shall mean: (i) the parcel of land and appurtenances thereto more particularly described on Schedule 1.49 hereto (including, without limitation, all rights-of-way, open or proposed streets, alleys, easements, strips, or gores of land adjacent thereto); (ii) the buildings, improvements, and structures located on such parcels of land and fixtures which are located at and affixed to any of such buildings, improvements, and structures, if any; and (iii) all tangible and intangible assets and personal property of any nature relating to any of the foregoing property, if any.

**1.1.51** "Receivables" shall mean all of the following now owned or hereafter arising or acquired property of Seller: (a) all Accounts, including, without limitation, all Credit Card Receivables, and all monies, credit balances and other amounts due from or through or held by credit card issuers, or other parties to the Credit Card Agreements, all monies paid by or through the credit card processor, all rentals or license fees receivable in respect of sale, lease, or license of any Customer Lists, all monies, securities and other property and the proceeds thereof, now or hereafter held or received by, or in transit to, Seller whether for collection or otherwise, and all of its respective deposits (general or special), balances, sums and credits at any time existing; (b) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account; (c) all payment intangibles of Seller; (d) letters of credit, indemnities, guarantees, security or other deposits and proceeds thereof issued payable to Seller or otherwise in favor of or delivered to Seller in connection with any Account; or (e) all other accounts, contract rights, chattel paper, instruments, notes, general intangibles and other forms of obligations owing to Seller, whether from the sale and lease of goods or other property, licensing of any property (including Intellectual Property Rights or other general intangibles), rendition of services or from loans or advances by Seller or to or for the benefit of any third person (including loans or advances to any Affiliates of Seller) or otherwise associated with any Account, Inventory or general intangibles of Seller (including, without limitation, choses in action, causes of action, any funds which may be payable to Seller in connection with the termination of any employee benefit plan and any other amounts payable to Seller from any employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, casualty or any similar types of insurance and an proceeds thereof and proceeds of insurance covering the lives of employees on which Seller is a beneficiary, catalogs and promotional materials, Customer Lists, and all right, title and interest in and to joint ventures, partnerships and other Persons).

**1.1.52** "Sale Motion" shall have the meaning set forth in the Recitals.

**1.1.53** "Sale Order" shall mean an order entered by the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, approving the transactions contemplated by this Agreement with Buyer or, as the context requires, with a third-party.

**1.1.54** "Tax" means any foreign, federal, state and local tax, charge or assessment by or liability to any Governmental Entity, including, but not limited to, any deficiency, interest or penalty.

**1.1.55** "Tax Return" means any return, report or declaration filed with or submitted to any Governmental Entity in connection with the assessment, collection or payment of any Tax.

**1.1.56** "Title Company" shall mean First American Title Insurance Company or any other title company acceptable to Buyer.

**1.1.57** "Transactional Taxes" shall mean all sales, use, goods and services, transfer, conveyance, bulk transfer, excise, stamp, documentary, retail sales, land transfer and other taxes and all other governmental duties, charges, fees, imposts and assessments, and all interest and penalties thereon and additions thereto, imposed at any time by any taxing authority with respect to the transfer, assignment, conveyance or delivery of the Purchased Assets.

**1.1.58** "Transferred Employees" shall have the meaning set forth in Section 6.6.

**1.1.59** "Union" shall mean New England Joint Board, Local No. 2001 of Unite HERE!

**1.1.60** "WAG Marketing" shall mean Women's Apparel Marketing Group, LLC, a Massachusetts limited liability company.

**Section 1.2   Rules of Construction.**   Article and Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement. All references to "Articles" or "Sections" without reference to a document other than this Agreement, are intended to designate articles and sections of this Agreement, and the words "herein," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular Article or Section, unless specifically designated otherwise. The use of the term "including" shall mean in all cases "including but not limited to," unless specifically designated otherwise. No rules of construction against the drafter of this Agreement shall apply in any interpretation or enforcement of this Agreement, any documents or certificates executed pursuant hereto, or any provisions of any of the foregoing.

## ARTICLE 2
## AGREEMENT OF PURCHASE AND SALE; PURCHASE PRICE

**Section 2.1   Agreement of Purchase and Sale.**   At the Closing, Seller agrees to sell, transfer, assign, and convey to Buyer, and Buyer agrees to purchase and accept, subject to the terms and conditions of this Agreement, good and marketable title in and to the Purchased Assets, in each case, free and clear of all Liens and Claims (other than Permitted Encumbrances) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

**Section 2.2   Purchase Price.**   In consideration for the sale, assignment, transfer, conveyance and delivery by the Seller of the Purchased Assets to Buyer:

(a)   Buyer shall pay Seller an aggregate purchase price for the acquired assets of Eleven Million Two Hundred Fifty Thousand Dollars ($11,250,000) (the "Purchase Price") at or before Closing, of which (i) $10,500,000 shall be paid (A) first by way of a dollar for dollar credit against the outstanding Pre-Petition Indebtedness of Seller to Buyer under the

Pre-Petition Loan Documents and/or any post-petition financing provided by Buyer to Seller including the "DIP Indebtedness" under the "DIP Facility" (as such terms are defined in the DIP Order) pursuant to and in accordance with Section 363(k) of the Bankruptcy Code, and (B) second in cash, but only to the extent the sum of the Pre-Petition Indebtedness and the DIP Indebtedness are less than $10,500,000; (ii) $250,000 payable in cash upon the earlier of three (3) business days following entry of a Sale Order approving the sale to Buyer or at the Closing; and (iii) $500,000 shall be paid at or prior to Closing by way of the Buyer Note described in Section 2.2(b) below.

(b)     At or prior to Closing, Buyer shall issue Seller a promissory note in the original principal amount of $500,000 (the "Buyer Note"). The Buyer Note shall not accrue interest, but shall be secured by a lien on all of Buyer's assets which shall be subordinate only to a lien in favor of any Person who provides a revolving line of credit to Buyer. Buyer's payment obligations under the Buyer Note shall commence on December 1, 2011, at which time Buyer shall make a payment of $150,000 in cash to Seller. The remaining $350,000 shall be paid in cash in nine (9) equal monthly installments commencing on March 1, 2012.

(c)     At or prior to Closing, Buyer shall assume and agree to duly perform and discharge, when due, all of the Assumed Liabilities.

**Section 2.3     Allocation of Purchase Price.**  The Parties intend that the transactions contemplated by this Agreement shall be treated for tax purposes as a taxable purchase. Within sixty (60) days after the Closing Date, Buyer will deliver to Seller a schedule allocating the Purchase Price in accordance with Section 1060 of the Code (the "Allocation Schedule"), which Allocation Schedule may be amended to the extent, and in a manner consistent with any adjustment to the Proration Items based on actual figures received. If, within fifteen (15) days after delivery of such Allocation Schedule, the Seller notifies the Buyer in writing that the Seller objects to the allocation, Seller and Buyer shall use their respective good faith efforts to resolve such dispute. If Seller and Buyer are unable to resolve such dispute, the Parties shall submit such dispute to the Bankruptcy Court for resolution.

**Section 2.4     No Liabilities Assumed.**  Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Buyer shall not assume, and shall not be deemed to have assumed, any debt, Claim, obligation or other Liability of Seller whatsoever except for the Assumed Liabilities.

**ARTICLE 3**
**BUYER'S DUE DILIGENCE / CONDITION OF**
**THE PURCHASED ASSETS**

**Section 3.1     Buyer's Inspections and Due Diligence.**  Seller acknowledges that Buyer shall have the ability to conduct, as applicable, examinations, inspections, testing, studies and investigations (collectively, "Due Diligence") of the Purchased Assets. Buyer may conduct such Due Diligence as it deems reasonably necessary or appropriate, and examine and investigate to its reasonable satisfaction all facts, circumstances, and matters relating to the Purchased Assets, title and survey matters, and any other matters it deems necessary or appropriate for purposes of

consummating this transaction. Seller agrees to cause its current management to cooperate and assist Buyer in connection with its Due Diligence.

**Section 3.2    Site Visits.** Buyer and its Permitted Outside Parties shall have reasonable access to the Purchased Assets for purposes of conducting Due Diligence. Buyer will conduct its Due Diligence so as to minimize, to the extent reasonably possible to do so, any interference with the operations of Seller. Buyer and all Permitted Outside Parties shall, in performing such Due Diligence, use its commercially reasonable efforts to comply with any and all laws, ordinances, rules, and regulations applicable to the Purchased Assets and will not engage in any activities which would violate any License or Environmental Laws or any other applicable laws.

**Section 3.3    Confidentiality.** Buyer agrees that any information obtained by Buyer or its Affiliates, lenders, investors, consultants, attorneys, accounts, and other advisors (collectively, the "Permitted Outside Parties") in the conduct of its Due Diligence shall be treated as confidential pursuant to Section 10.9 of this Agreement and shall be used only to evaluate the acquisition of the Purchased Assets from Seller.

**Section 3.4    Maintenance of Purchased Assets.** From the date hereof until the Closing Date, and except as otherwise consented to or approved by Buyer in writing, Seller covenants and agrees with Buyer that Seller will, from the date hereof until the Closing Date or earlier termination of this Agreement: (i) maintain each of the Purchased Assets to keep such Purchased Assets in such condition as they were in as of the Petition Date, subject to ordinary wear and tear and, with respect to Inventory and Accounts Receivable, subject to sale and collection, as the case may be, in the ordinary course of business; and (i) maintain, at Seller's expense, all risk coverage insurance on the Purchased Assets as in effect as of the Petition Date.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

**Section 4.1    Representations and Warranties of Seller.** Seller represents and warrants to Buyer, as of the date hereof, as follows:

(a)    Status. Seller is a limited liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation. Seller is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required.

(b)    Authority. Subject to any necessary authorization from and the jurisdiction of the Bankruptcy Court, Seller has all requisite power and authority to own its properties and assets and to carry on its business as it is now being conducted. After giving effect to the Sale Order, the execution and delivery of this Agreement and the performance of Seller's obligations hereunder have been or will be duly authorized by all necessary action on the part of Seller, and this Agreement constitutes the legal, valid and binding obligation of Seller, subject to equitable principles and principles governing creditors' rights generally.

(c)    Non-Contravention. After giving effect to the Sale Order, the execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby will not: (i) violate any judgment, order, injunction, decree, regulation or

ruling of any court or Governmental Entity; (ii) conflict with, result in a breach of, or constitute a default under the organic documents of Seller; or (iii) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which it is bound or to which any of its respective assets are subject (or result in the imposition of any lien upon any of its respective assets), except where the violation, breach, default, acceleration, termination, modification, cancellation, failure to give notice or lien would not be materially adverse to any Purchased Assets, or the ability of Seller to consummate the transactions contemplated by this Agreement.

(d)     Suits and Proceedings.  Except as set forth on Schedule 4.1(d)(i), there are no actions, suits, investigations or proceedings pending or threatened against or involving Seller or the Purchased Assets.  Except as set forth on Schedule 4.1(d)(ii), there are no outstanding orders, rulings, decrees, judgments, or stipulations to which Seller is a party or by which Seller or any of the Purchased Assets are bound, by or with any court, arbitrator or administrative agency that are not stayed under 11 U.S.C. §362 or that would affect the Purchased Assets after the entry of the Sale Order.

(e)     Non-Foreign Entity.   Seller is not a "foreign person" or "foreign corporation" as those terms are defined in the Code and the regulations promulgated thereunder.

(f)     Consents.  After giving effect to the Sale Order, no consent, waiver, approval or authorization is required from any person or entity (that has not already been obtained) in connection with the execution and delivery of this Agreement by Seller or the performance by Seller of the transactions contemplated hereby.

(g)     Compliance with Laws.  Except as set forth on Schedule 4.1(g), to Seller's knowledge, Seller has complied in all material respects with all laws, regulations, rules, orders, judgments, decrees and other requirements imposed by federal, state, and local Governmental Entities applicable to them in the operation or ownership of the Purchased Assets (the "Applicable Laws").

(h)     Environmental Matters.  Except as set forth on Schedule 4.1(h): (a) there have been and are no past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the release, emission, discharge, presence or disposal of any Hazardous Materials on any of the Purchased Assets or any other property that could reasonably form the basis of any environmental claim against Seller or against any Person whose liability for any environmental claim Seller has or may have retained or assumed either contractually or by operation of law; or (b) there has been no violation of any Environmental Law in any material respect.  Except as set forth on Schedule 4.1(h), Seller has not received any actual or threatened order, notice or other written communication from any Governmental Entity with respect to any of the Purchased Assets of any actual or potential violation or failure to comply with any Environmental Law.

(i)     Title.  Seller has good and marketable title to and lawful ownership of the Purchased Assets, free and clear of all Liens.  Seller has not received any written notice from any

Governmental Entity or other Person with respect to the ownership or use of the Purchased Assets that might adversely affect the rights of Buyer in Purchased Assets.

(j)    Zoning.  To Seller's knowledge: (i) the Real Property complies in all material respects with all applicable zoning, building, fire and safety codes or regulations; (ii) there is no plan, study or effort by any Governmental Entity to alter or change the zoning of the Real Property; and (iii) Seller has not received any notices regarding Seller's use of the Real Property.

(k)    Purchased Assets.  After giving effect to the Sale Order, at Closing, Seller will transfer and convey to Buyer good and marketable title to the Purchased Assets, free and clear of all Liens. The Purchased Assets are in good operating condition and repair, normal wear and tear excepted, and have been maintained in accordance with all applicable specifications and warranties and normal industry practice.

(l)    Taxes.  Seller has filed or caused to be filed, within the times and within the manner prescribed by law, all federal, provincial and local tax returns and tax reports which are required to be filed by Seller. Such returns and reports reflect accurately all liability for taxes of Seller for the periods covered thereby. All federal, provincial, state and local income, profits, sales, use, occupancy, excise and other taxes, assessments and reassessments (including interest and penalties) payable by, or due from, Seller have been fully paid or adequately disclosed and fully provided for on Schedule 4.1(l) and/or the books and records of Seller. There are no actions, suits or other proceedings or investigations or claims in progress, pending or, to Seller's knowledge threatened against any Seller in respect of any taxes, governmental charges or assessments and, in particular, there are no currently outstanding reassessments or written enquiries which have been issued or raised by any governmental authority relating to any such taxes, governmental charges and assessments that are not otherwise going to be paid. Seller has withheld and remitted all amounts required to be withheld and remitted by them in respect of any taxes, or will remit such amounts promptly after Closing.

(m)    Brokers.  Seller hereby represents and warrants to Buyer that it did not employ or use any broker or finder to arrange or bring about this transaction, and that there are no claims or rights for brokerage commissions or finder's fees in connection with the transactions contemplated by this Agreement.

(n)    AS IS, WHERE IS.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT: (I) SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE, QUALITY OR PROSPECTS OF THE PURCHASED ASSETS; AND (II) SELLER SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE PURCHASED ASSETS, IT BEING UNDERSTOOD THAT THE PURCHASED ASSETS ARE BEING ACQUIRED "AS IS, WHERE IS" ON THE CLOSING DATE, AND IN THEIR PRESENT CONDITION, AND BUYER SHALL RELY ON ITS OWN EXAMINATION AND INVESTIGATION THEREOF.

(o)    Limitation of Representations and Warranties. The representations and warranties contained in this Article 4 shall not survive Closing. From and after the Closing, the Seller shall have no liability for any breach of any representation, covenant or warranty contained in this Article 4, regardless of whether such breach occurred prior to or after the Closing.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

**Section 5.1    Buyer's Representations and Warranties.**    Buyer represents and warrants to Seller, as of the date hereof, the following:

(a)    Status. Buyer is a corporation duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation. Buyer is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required.

(b)    Authority. After giving effect to the Sale Order, the execution and delivery of this Agreement and the performance of Buyer's obligations hereunder have been or will be duly authorized by all necessary action on the part of Buyer and this Agreement constitutes the legal, valid and binding obligation of Buyer, subject to equitable principles and principles governing creditors' rights generally.

(c)    Non-Contravention. After giving effect to the Sale Order, the execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby will not violate any judgment, order, injunction, decree, regulation or ruling of any court or Governmental Entity or conflict with, result in a breach of, or constitute a default under the organic documents of Buyer, any note or other evidence of indebtedness, any mortgage, deed of trust or indenture, or any lease or other material agreement or instrument to which Buyer is a party or by which it is bound.

(d)    Consents. After giving effect to the Sale Order, no consent, waiver, approval or authorization is required from any person or entity (that has not already been obtained) in connection with the execution and delivery of this Agreement by Buyer or the performance by Buyer of the transactions contemplated hereby.

(e)    Brokers. Buyer hereby represents and warrants to Seller that it did not employ or use any broker or finder to arrange or bring about this transaction, and that there are no claims or rights for brokerage commissions or finder's fees in connection with the transactions contemplated by this Agreement.

(f)    Limitation of Representations and Warranties. The representations and warranties contained in this Article 5 shall not survive Closing. From and after the Closing, the Buyer shall have no liability for any breach of any representation, covenant or warranty contained in this Article 5, regardless of whether such breach occurred prior to or after the Closing.

## ARTICLE 6
## ADDITIONAL COVENANTS

**Section 6.1     Bankruptcy Matters.** Seller will use commercially reasonable efforts to have the Bankruptcy Court: (i) schedule a hearing to approve the Bid Procedures and notice of sale in form required by the Bankruptcy Court; and (ii) enter the Bid Procedures Order and notice of sale as soon as practicable (iii) schedule a hearing on the Sale Motion in accordance with the time periods required by the Bid Procedures; and (ii) enter the Sale Order (in substantially the form attached to the Sale Motion) as soon as practicable. Buyer shall use its commercially reasonable efforts to assist Seller in obtaining the Sale Order, including providing testimony as required at any hearing before the Bankruptcy Court.

**Section 6.2     Access to Information and Facilities.** Prior to Closing, Seller shall allow Buyer and its Permitted Outside Parties to make such inspection of the Purchased Assets, and to inspect and make copies of Seller's contracts, books and records and all other documents and information requested by Buyer and related to the Purchased Assets. Following the Closing, Buyer shall, upon reasonable request by the Seller, the Committee or any successor to the Seller's estate, including, without limitation, any trust created in connection with the liquidation and distribution of the Seller's assets (a) provide reasonable access, during normal business hours and upon reasonable advance notice to the Seller's Books and Records or the Books and Records of any of Seller's Affiliates, or other information relating to the Purchased Assets, the Seller's employees or the Assumed Liabilities and (b) make Buyer's officers, employees, representatives, consultants, and advisors reasonably available at no charge to the Seller.

**Section 6.3     Best Efforts; Further Assurances.**

(a)     Seller will use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions to Closing of this Agreement and to timely obtain any and all consents required for the consummation of the transactions contemplated by this Agreement as soon as practicable.

(b)     Seller shall execute such documents and use commercially reasonable efforts to take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement (including, without limitation, to put Buyer in actual possession and control of the Purchased Assets, to effectuate, record or perfect the transfer of the Purchased Assets to Buyer, to confirm the title of the Purchased Assets in Buyer, to assist Buyer in exercising rights relating thereto, to obtain all consents, approvals and authorizations of third parties, to make all filings with and give all notices to third parties which may be necessary or required in order to effectuate the transactions contemplated hereby). The obligations of Seller set forth in the first sentence of this Section 6.3(b) shall survive the Closing.

**Section 6.4     Continued Effectiveness of Representations and Warranties.** From the date hereof through the Closing Date, except as otherwise expressly contemplated by this Agreement, Seller shall use commercially reasonable efforts to cause the representations and warranties made in this Agreement to continue to be true and correct in all material respects on and as of the Closing Date as if made on and as of the Closing Date. Seller shall promptly notify

Buyer and Buyer shall promptly notify Seller of any event, condition or circumstance occurring from the date hereof through the Closing Date that would constitute a material violation or breach of any of the respective representations or warranties made by Seller contained in this Agreement if made on such date.

**Section 6.5   Ordinary Course**.  Prior to the Closing Date, Seller shall operate its business in the ordinary and usual course of normal day-to-day operations of the business, consistent with past practice, pursuant to Seller's authorized use of cash collateral and any additional funds loaned to Seller pursuant to the DIP Order.

**Section 6.6   Employment Matters**.   Subject to the execution of definitive agreement(s) between Buyer and the Union, Buyer shall cause all of the current employees of Seller who are members of the Union to be offered employment by Buyer's staffing contractor on terms substantially similar to the current terms of employment as agreed to by Buyer and the Union. Buyer further agrees to offer employment to at least 40 current employees of Seller who are not members of the Union on terms substantially similar to their current terms of employment with Seller (such unionized and non-unionized employees, collectively, the "Transferred Employees"). Buyer shall use commercially reasonable efforts to obtain a waiver from each Transferred Employee and the Union, in favor of the Seller, waiving any liability under the WARN Act.

**Section 6.7   Customer Returns and Credits**. From and after the Closing, Buyer shall use commercially reasonable efforts to honor or otherwise make provisions to Seller's customers with respect to outstanding gift cards, merchandise credits and unprocessed customer returns of Seller to the extent such gift cards, merchandise credits and returns were incurred in the ordinary course of business and issued by Seller prior to the Closing.

**Section 6.8   Removal of Purchased Assets**.  With respect to the Buyer's leased premises in Taunton, Massachusetts, the Buyer shall be liable to the lessor of such premises for (i) any damage to the Premises related to the removal of the Purchased Assets therefrom and (ii) restoring the Premises to the condition it was before the Purchased Assets were removed, the cost of which shall be Assumed Liabilities.

**Section 6.9   Return of Redcats Equipment**.    Upon Closing, the Debtor will immediately make available all the Redcats Equipment as directed by Redcats USA, Inc.

## ARTICLE 7
## CONDITIONS TO CLOSING

**Section 7.1   Buyer's Conditions**. Buyer's obligation to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or written waiver on or prior to the Closing Date of all of the following conditions, any or all of which may be waived in whole or in part in writing by Buyer:

**7.1.1   Representations, Warranties, and Covenants of Seller**.   The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date, and the covenants and

agreements of Seller to be performed on or before the Closing Date in accordance with this Agreement shall have been duly performed in all material respects. At the Closing, Seller will deliver to Buyer a certificate of an officer of Seller dated as of the Closing Date, whereby such officer certifies that the conditions set forth in this <u>Section 7.1.1</u> have been satisfied.

7.1.2    **Filings; Consents; Waiting Periods**.  All consents required for Seller to perform this Agreement in accordance with the Bankruptcy Code and any other Applicable Laws shall have been obtained and shall be in full force and effect on the Closing Date, and each approval or consent required under such laws to be obtained before consummation of the transaction shall have been obtained or waived and all waiting and other time periods under such laws shall have expired, lapsed or been terminated.  No injunction or restraining order shall have been issued by any court of competent jurisdiction and be in effect which restrains or prohibits any material transaction contemplated hereby and no other legal restraint or prohibition preventing the consummation of any material transaction shall be in effect.

7.1.3    **Entry of Orders By Bankruptcy Court**.  Each of the Sale Order and the Bid Procedures Order, both in forms reasonably acceptable to Buyer, shall have been entered by the Bankruptcy Court and shall not have been vacated, stayed, or reversed, or modified, amended, or supplemented in any manner adverse in any material respect to Buyer.

7.1.4    **Title Commitment**.  At Closing, the Title Company shall issue to Buyer or be irrevocably committed to issue to Buyer an extended coverage ALTA owner's form title policy with respect to the Real Property in an amount acceptable to Buyer, insuring that fee simple title to the Real Property is vested in Buyer free and clear of all Liens.  Buyer shall be entitled to request that the Title Company provide such endorsements (or amendments) to the Title Policies as Buyer may reasonably require, provided that: (i) such endorsements (or amendments) shall be at no cost to, and shall impose no additional liability on, Seller; and (ii) the Closing shall not be materially delayed as a result of Buyer's request.

7.1.5    **Litigation**.  No action, suit or other proceedings shall be pending before any Governmental Entity seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the material violation of any law, decree or regulation of any Governmental Entity having appropriate jurisdiction.

7.1.6    **Material Adverse Change**.  Since the date of this Agreement, there shall not have been a material adverse change with respect to the Purchased Assets.

7.1.7    **Other**.  Seller shall have delivered all items and satisfied all obligations pursuant to <u>Section 8.2</u>.

**Section 7.2    Seller's Conditions**.  Seller's obligation to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or written waiver on or prior to the Closing Date of all of the following conditions, any or all of which may be waived in whole or in part in writing by Seller:

7.2.1    **Representations, Warranties, and Covenants of Buyer**.  The representations and warranties of Buyer contained in this Agreement shall be true and correct in

all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date, and the covenants and agreements of Buyer to be performed on or before the Closing Date in accordance with this Agreement shall have been duly performed in all material respects.

**7.2.2** **Filings; Consents; Waiting Periods**. All consents required for Seller to perform this Agreement in accordance with the Bankruptcy Code shall have been obtained and shall be in full force and effect on the Closing Date, and each approval or consent required under such laws to be obtained before consummation of the transaction shall have been obtained or waived and all waiting and other time periods under such laws shall have expired, lapsed or been terminated. No injunction or restraining order shall have been issued by any court of competent jurisdiction and be in effect which restrains or prohibits any material transaction contemplated hereby and no other legal restraint or prohibition preventing the consummation of any material transaction shall be in effect.

**7.2.3** **Entry of Orders By Bankruptcy Court**. Each of the Sale Order and the Bid Procedures Order, both in forms reasonably acceptable to Buyer, shall have been entered by the Bankruptcy Court and shall not have been vacated, stayed, or reversed, or modified, amended, or supplemented in any manner adverse in any material respect to Buyer.

**7.2.4** **Privacy Policy**. The Buyer has the systems in place and safeguards required to treat all confidential customer information in any form received from the Seller, including, without limitation, any Customer List in strict compliance with the Privacy Policy of the Seller.

**7.2.5** **Release of Tax Refund**. Seller shall have received evidence, reasonably satisfactory to the Seller and the Committee, that Women's Apparel Group Holdings, Inc. has released and assigned to the Seller or its estate all rights, title and interest to the Tax Refund;

**7.2.6** **Other**. Buyer shall have delivered all items and satisfied all obligations pursuant to Section 8.3.

**ARTICLE 8**
**CLOSING**

**Section 8.1**    **Closing**. The closing hereunder ("Closing") shall be held and delivery of all items to be made at the Closing under the terms of this Agreement shall be made on such date as may be agreed to by Buyer and Seller after the Sale Order shall have become a Final Order (the "Closing Date"); provided, however, that the Closing shall occur no later than October 31, 2011, unless agreed to in writing by the Seller, the Buyer and the Committee.

**Section 8.2**    **Seller's Closing Documents and Other Items**. At or before Closing, Seller shall deliver to Buyer the following items:

**8.2.1** A duly executed and acknowledged "Special Warranty Deed" in favor of Buyer with respect to the Real Property (or equivalent transfer document applicable in the jurisdiction where such Real Property is located);

**8.2.2**   One (1) duly executed counterpart of the Bill of Sale;

**8.2.3**   All Books and Records in Seller's possession, custody or control that relate to the Purchased Assets; and

**8.2.4**   Such other documents as may be reasonably requested by Buyer to consummate the purchase of the Purchased Assets as contemplated by this Agreement.

**Section 8.3   Buyer's Closing Documents and Other Items.**   At or before Closing, Buyer shall deliver to Seller the following items:

**8.3.1**   Payment of the Purchase Price as set forth in Section 2.2;

**8.3.2**   One duly executed counterpart of the Bill of Sale;

**8.3.3**   One (1) duly executed counterpart of the Buyer Note, together with an executed security agreement and intercreditor agreement relating to the liens granted by Buyer to secure payments under the Buyer Note, each in form and substance reasonably acceptable to Seller and the Committee; and

**8.3.4**   Such other documents as may be agreed upon by Seller and Buyer to consummate the purchase of the Purchased Assets as contemplated by this Agreement.

**Section 8.4   Transactional Taxes and Recording of Documents.**   Buyer shall be responsible, at its sole cost and expense, for all Transactional Taxes in connection with the transactions contemplated by this Agreement and the filing or recording of such deeds, assignments, instruments or documents delivered by Seller hereunder, however effected, and for the preparation, recording and filing of such additional assignments, instruments or documents as may be necessary or appropriate to perfect the right, title or interest of Buyer to or in the Purchased Assets.

**Section 8.5   Taxes and Other Costs.**

**8.5.1**   Upon, from and after the Closing, Buyer shall assume and become solely liable and responsible for (i) all Taxes that constitute administrative expense claims against the Seller or its bankruptcy estate through the Closing; and (ii) all Taxes attributable to the Purchased Assets from and after the Closing.

**8.5.2**   Buyer shall pay (a) all charges and premiums payable with respect to any title policy in connection with the Real Property (including the cost of any endorsements and any title examination fees); (b) the recording fees required in connection with the transfer of the Real Property to Buyer; (c) all state and local transfer taxes payable as a result of the transfer of the Real Property by Seller to Buyer; and (e) any additional costs and charges customarily charged to buyers in accordance with common escrow practices in the jurisdictions in which the Real Property is located, other than those costs and charges specifically required to be paid by Seller hereunder.

**Section 8.6   Designation of Assigned Contracts and Assigned Leases; Cure Costs.**

    **8.6.1**   No later than twenty-one (21) days prior to the Closing, the Buyer may, by written notice to the Seller (the "<u>Designation Notice</u>"), designate which Contracts and Leases it wishes to have the Seller assume and assign to the Buyer as Assigned Contracts and Assigned Leases.

    **8.6.2**   No later than five (5) days following receipt of the Designation Notice, the Seller shall (i) file with the Bankruptcy Court a motion to assume and assign such Assigned Contracts and Assigned Leases to Buyer (an "<u>Assignment Motion</u>"); and (ii) serve on all counterparties to Assigned Contracts and Assigned Leases a notice (an "<u>Assignment Notice</u>") containing (a) a statement that any assumption and assignment shall be allowed only to the extent permitted under section 365 of the Bankruptcy Code, (b) a description of the Assigned Contract or Assigned Lease by title and date and any amendment thereto, (c) the total amount that the Buyer shows on its books and records as due and payable to cure any payment default under the Assigned Contract or Assigned Lease through the date of its proposed assumption (the "<u>Cure Amount</u>"), (d) the name and address of the Buyer, (e) evidence from the Buyer that the Buyer can provide adequate assurance of future performance, which evidence may be supplemented after delivery of the notice, (f) the name and address of the party from which the holder of the Assigned Contract or Assigned Lease may obtain financial information about the Buyer, and (g) the time by which any objection to such assumption and assignment under section 365 of the Bankruptcy Code must be filed with the Bankruptcy Court, which date shall be no earlier than fourteen (14) days of service of such notice. In the event of an objection to the proposed assumption and assignment of, or Cure Amount related to, an Assigned Contract or Assigned Lease, the Seller and Buyer shall, at the Buyer's sole expense, attempt to resolve such objection or litigate such objection under such procedures as the Bankruptcy Court shall approve and proscribe. It shall not be a condition to Closing that any Contract or Lease be assumed and assigned to the Buyer. In the event that a dispute regarding the assumption and assignment of, or the Cure Amount related to, an Assigned Contract or Assigned Lease is not resolved as of the Closing, the parties shall nonetheless remain obligated to consummate the Sale of the Purchased Assets, excluding any such Assigned Contract or Assigned Lease for which an objection is outstanding and unresolved. Buyer may, at any time prior to assumption, by written notice to Seller, remove any Contract or Lease from the Designation Notice. The Buyer shall be responsible for the payment of all Cure Amounts.

    **8.6.3**   From the date hereof until the Closing, the Buyer and Seller will confer with one another with respect to the assumption and assignment of Contracts and Leases and work, in good faith, to identify any Contracts and Leases that the Buyer will not seek to have assumed and assigned so that the Seller can promptly seek rejection of such Contacts and Leases.

                        21

## ARTICLE 9
## TERMINATION

**Section 9.1**    <u>Termination</u>.    In addition to the other rights of termination set forth in this Agreement, prior to the Closing, this Agreement may be terminated:

**9.1.1**    by Buyer, if the Sale Order is not entered by the Bankruptcy Court on or before September 15, 2011; or

**9.1.2**    by Buyer, if Seller has materially breached or failed to comply with its representations, warranties, covenants, or obligations under this Agreement such that the conditions precedent set forth in <u>Section 7.1</u> would not reasonably be expected to be satisfied, such breach or failure to comply shall not have been cured within a period of ten (10) days after Buyer shall have given written notice to Seller of such breach or failure to comply; <u>provided</u> that Buyer will not be entitled to so terminate this Agreement if Buyer is then in breach, in any material respect, of this Agreement; or

**9.1.3**    by Seller, if Buyer has materially breached or failed to comply with its representations, warranties, covenants, or obligations under this Agreement such that the conditions precedent set forth in <u>Section 7.2</u> would not reasonably be expected to be satisfied, such breach or failure to comply shall not have been cured within a period of ten (10) days after Seller shall have given written notice to Buyer of such breach or failure to comply; <u>provided</u> that Seller will not be entitled to so terminate this Agreement if Seller is then in breach, in any material respect, of this Agreement; or

**9.1.4**    by Buyer, (i) in the event of the failure of any condition to closing set forth in <u>Section 7.1</u>; or (ii) at such time as a Sale Order that names any party other than Buyer (or any of its Affiliates) as the "Successful Bidder" for the Purchased Assets becomes a Final Order and, to the extent applicable, Buyer is not designated as the "Back-Up Bidder" (as such terms are defined in the Bid Procedures).

**Section 9.2**    <u>Remedies</u>.    In the event of termination of this Agreement pursuant to Section 9.1:

**9.2.1**    all obligations of the parties hereto under this Agreement shall terminate and there shall be no liability of any party hereto to any other party and, except for Seller's obligation to pay the Expense Reimbursement to Buyer, each party hereto shall bear its own expenses incurred in connection with the negotiation, preparation, execution and performance of this Agreement; <u>provided</u> that the foregoing shall not relieve a party of liability for damages actually incurred by the other party as a result of any breach of this Agreement by such party;

**9.2.2**    if the termination is by Buyer pursuant to Section 9.1.4 because the Bankruptcy Court has approved the sale of the Purchased Assets to a person(s) other than Buyer and the Buyer is not designated as the Back-Up Bidder, Seller shall pay Buyer, promptly following the Closing of such higher offer and prior to disbursement of such proceeds to any party, an amount equal to the documented, reasonable out-of-pocket costs and expenses reasonably incurred by or on behalf of or borne by the Buyer in connection with (i) the negotiation, execution, delivery and performance of this Agreement, (ii) their appearance or

participation in the Case in connection with the Sale, and (iii) their participation in the process contemplated by the Bid Procedures Order, including all reasonable and documented fees and expenses of counsel, accountants and financial and other advisers related thereto, up to an aggregate maximum amount of $420,000 (the "Expense Reimbursement"). If the Buyer is not the winning bidder, within three business (3) days after the "Auction" (as defined in the Bid Procedures), the Buyer shall serve on counsel for the Seller, the Committee and the U.S. Trustee copies of all invoices comprising the Expense Reimbursement. The Seller shall pay the Expense Reimbursement unless the Seller, the Committee or the U.S. Trustee objects, in writing, within seven (7) days of receipt of the invoices, to the reasonableness of the fees, costs and expenses included in any invoices submitted hereunder. If any objection remains unresolved after seven (7) days, the objection may be submitted to the Court. The Buyer reserves the right to seek payment of the Expense Reimbursement as an administrative expense of Seller's bankruptcy estate pursuant to 11 U.S.C. § 503(b).

## ARTICLE 10
## MISCELLANEOUS

**Section 10.1   Amendment and Modification.**   Any modification, amendment or waiver of or with respect to any provision of this Agreement or any other document delivered pursuant hereto shall not be effective unless it shall be in writing and signed by Seller and Buyer and shall designate specifically the terms and provisions so modified.

**Section 10.2   Notices.**   All notices required or permitted hereunder shall be in writing and shall be served on the parties at the following address:

|  |  |
|---|---|
| If to Seller: | Women's Apparel Group, LLC<br>300 Constitution Drive<br>Taunton, Massachusetts 02780<br>Attention: CEO<br>Fax: (508) 895-4111 |
| with copies to: | Nutter McClennen & Fish LLP<br>Seaport West<br>155 Seaport Boulevard<br>Boston, Massachusetts 02210<br>Attention: Richard S. Rosenstein<br>Fax: (617) 310.9563 |
| and to: | Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attn: Eric R. Wilson and Jason R. Adams<br>Fax: (212) 808-7897 |
| If to Buyer: | c/o Blackstreet Capital Management, LLC<br>5425 Wisconsin Avenue, Suite 701<br>Chevy Chase, MD 20815 |

                                           Attention: Lawrence S. Berger
                                           Fax: (240) 223-1331

with copies to:                       Patton Boggs LLP
                                           8484 Westpark Drive, 9th Floor
                                           McLean, Virginia 22102
                                           Attention:  Alan Noskow
                                           Fax:  (703) 744-8001

Any such notices may be sent by: (a) certified mail, return receipt requested, in which case notice shall be deemed delivered three (3) business days after deposit, postage prepaid in the U.S. mail; (b) a nationally recognized overnight courier, in which case notice shall be deemed delivered one (1) business day after deposit with such courier; or (c) facsimile transmission, in which case notice shall be deemed delivered upon electronic verification that transmission to recipient was completed, but only if such notice is also sent by certified mail, return receipt requested or by a nationally recognized overnight courier.  The above addresses and facsimile numbers may be changed by written notice to the other party; provided that no notice of a change of address or facsimile number shall be effective until actual receipt of such notice.  Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.

      **Section 10.3    Assignment.**    This Agreement shall be binding upon and inure to the benefit of the parties hereto and its respective successors and assigns (including any trustee appointed in respect of Seller under the Bankruptcy Code).  Without limiting any of Buyer's duties and obligations arising under this Agreement with respect to the Purchased Assets may be assigned by Buyer, in whole, in part, or in multiple parts upon Buyer delivering written notice thereof to Seller.  Seller shall not assign its rights or delegate its obligations under this Agreement without the express prior written consent of Buyer.

      **Section 10.4    Governing Law.**  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ANY OTHERWISE APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS.

      **Section 10.5    Counterparts.**    This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.  This Agreement may be executed and delivered by facsimile transmission or by electronic mail in portable document format with the same effect as if a manually signed original were personally delivered.

      **Section 10.6    Entire Agreement.**    This Agreement and any other document to be furnished pursuant to the provisions hereof embody the entire agreement and understanding of the parties hereto as to the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants, or undertakings other than those expressly set forth or referred to in such documents.  This Agreement and such documents supersede all prior agreements and understandings among the parties with respect to the subject matter hereof.

**Section 10.7   Severability.**  Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, or affecting the validity or enforceability of any of the terms or provisions of this Agreement.

**Section 10.8   Attorney Fees.**  If any action is brought by any party to this Agreement to enforce or interpret its terms or provisions, the prevailing party will be entitled to reasonable attorney fees and costs incurred in connection with such action prior to and at trial and on any appeal therefrom.

**Section 10.9   Confidential Information.**  The parties acknowledge that the transaction described herein is of a confidential nature and shall not be disclosed except: (i) to Permitted Outside Parties; (ii) as required by law; (iii) as expressly contemplated by this Agreement (including, without limitation, pursuant to the Sale Motion); or (iv) as otherwise required by the Bankruptcy Court in the Case.  In connection with the negotiation of this Agreement and the preparation for the consummation of the transactions contemplated hereby, each party acknowledges that it will have access to confidential information relating to the other party. Each party shall treat such information as confidential, preserve the confidentiality thereof, and not duplicate or use such information, except to Permitted Outside Parties in connection with the transactions contemplated hereby.  In the event of the termination of this Agreement for any reason whatsoever, Buyer shall return to Seller, all documents, work papers, engineering and environmental studies and reports and all other materials (including all copies thereof obtained from Seller in connection with the transactions contemplated hereby), if any, and each party shall use its reasonable best efforts, including instructing its employees and others who have had access to such information, to keep confidential and not to use any such information.  Except as required by applicable law or as otherwise contemplated by this Agreement, no party shall issue any press release or make any statement to the media, without the other party's consent, which consent shall not be unreasonably withheld.  The provisions of this Section 10.10 shall survive the Closing or, if the purchase and sale is not consummated, any termination of this Agreement.

**Section 10.10   No Joint Venture.**  Nothing set forth in this Agreement shall be construed to create a joint venture between Buyer and Seller.

**Section 10.11   Jurisdiction.**  For so long as Seller (or any of its successors or assigns) remain subject to the jurisdiction of the Bankruptcy Court, the Bankruptcy Court shall have jurisdiction over any dispute arising out of or in connection with the transactions contemplated by this Agreement.  The parties hereto consent to the exclusive jurisdiction of the Bankruptcy Court (and the appropriate appellate courts therefrom) in any such dispute and irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of the venue of any such dispute in the Bankruptcy Court or that any such dispute which is brought in the Bankruptcy Court has been brought in an inconvenient forum.

**Section 10.12   Waiver of Jury Trial.**  Each party to this Agreement hereby expressly waives any right to trial by jury of any claim, demand, action or cause of action (each, an "Action"): (a) arising out of this Agreement, including any present or future amendment thereof; or (b) in any way connected with or related or incidental to the dealings of the parties or any of

them with respect to this Agreement (as hereafter amended) or any other instrument, document or agreement executed or delivered in connection herewith, or the transactions related hereto or thereto, in each case whether such Action is now existing or hereafter arising, and whether sounding in contract or tort or otherwise and regardless of which party asserts such Action; and each party hereby agrees and consents that any such Action shall be decided by court trial without a jury, and that any party to this Agreement may file an original counterpart or a copy of this section with any court as written evidence of the consent of the parties to the waiver of any right they might otherwise have to trial by jury.

Section 10.13 **Time of Essence.** Time is of the essence of this Agreement.

Section 10.14 **No Waiver.** No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver, nor shall a waiver in any instance constitute a waiver in any subsequent instance. No waiver shall be binding unless executed in writing by the party making the waiver.

[Remainder of Page Blank -- Signature Page Follows]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**BUYER:**                                    **SELLER:**

**DISTINCTIVE APPAREL, INC.**          **WOMEN'S APPAREL GROUP, LLC**

By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____